No. 22-15916

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DZ RESERVE AND CAIN MAXWELL, DBA MAX MARTIALIS,

*Plaintiffs - Appellees.*

v.

META PLATFORMS, INC, FKA FACEBOOK, INC.,

*Defendant - Appellant.*

On Appeal from the United States District Court
for the Northern District of California, Case No. 3:18-cv-04978-JD
The Honorable James Donato

## OPENING BRIEF OF APPELLANT META PLATFORMS, INC.

Elizabeth L. Deeley
Melanie M. Blunschi
Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020

October 31, 2022

Andrew B. Clubok
Susan E. Engel
Margaret A. Upshaw
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
andrew.clubok@lw.com

*Counsel for Appellant Meta Platforms, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellant Meta Platforms, Inc. ("Meta") by and through its undersigned counsel, hereby certifies that Meta has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

/s/ Andrew B. Clubok
Andrew B. Clubok
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
(202) 637-2200

*Counsel for Appellant*
*Meta Platforms, Inc.*

i

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION............................................................4

STATEMENT OF THE ISSUES..............................................................5

STATEMENT OF ADDENDUM .............................................................5

STATEMENT OF THE CASE.................................................................6

    A.    Factual Background.................................................................6

    B.    Procedural Background ..........................................................12

SUMMARY OF ARGUMENT ...............................................................17

STANDARD OF REVIEW ....................................................................20

ARGUMENT .....................................................................................21

I.    THE CLASS DOES NOT SATISFY RULE 23(b)(3)'s PREDOMINANCE REQUIREMENT.........................................................21

    A.    Fraud Claims Satisfy Predominance Only In Narrow Circumstances ..................................................................21

    B.    Predominance Is Lacking Because The Claims Of Differently Situated Class Members, Exposed To Different Representations, Cannot Be Evaluated Through Common Evidence ..........................25

        1.    Falsity and materiality cannot be proven on a class-wide basis........................................................................26

        2.    Actual reliance cannot be proven on a class-wide basis...........32

        3.    Resulting injury cannot be proven on a class-wide basis ........41

**Page**

C.  The District Court Improperly Ignored The Variations In The Class ...................................................................................45

II.   THE NAMED PLAINTIFFS CANNOT REPRESENT THE CLASS .........49

A.  The Named Plaintiffs Are Not Typical Of The Class Or Adequate To Represent The Class.......................................................50

B.  The Named Plaintiffs Lack Article III Standing To Pursue Their UCL Claim For Injunctive Relief.........................................54

   1.   Plaintiffs' asserted future injury is not concrete ......................55

   2.   Plaintiffs' asserted future injury is not actual or imminent ......57

CONCLUSION .................................................................................60

STATEMENT OF RELATED CASES .................................................61

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................21, 22, 35

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013)......................................................................43, 45

*Automotive Industries Pension Trust Fund v. Textron Inc.*,
682 F.3d 34 (1st Cir. 2012)....................................................................29

*B.K. ex rel. Tinsley v. Snyder*,
922 F.3d 957 (9th Cir. 2019) ................................................................55

*Bain v. California Teachers Association*,
891 F.3d 1206 (9th Cir. 2018) ..............................................20, 58, 60

*Banks v. Secretary, Department of Health & Human Services*,
38 F.4th 86 (11th Cir. 2022) ................................................................60

*Berger v. Home Depot USA, Inc.*,
741 F.3d 1061 (9th Cir. 2014), *abrogated on other grounds by*
*Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017) ..........................17, 24, 30, 31

*Briseno v. Conagra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ..............................................................35

*Bykowicz v. Pulte Home Corp.*,
950 F.2d 1046 (5th Cir. 1992) ..............................................................28

*Carney v. Adams*,
141 S. Ct. 493 (2020)......................................................................57, 58

*Carrera v. First American Home Buyers Protection Co.*,
702 F. App'x 614 (9th Cir. 2017)......................................................24, 34

*CE Design Ltd. v. King Architectural Metals, Inc.*,
637 F.3d 721 (7th Cir. 2011) ..........................................50, 51, 53, 54

iv

**Page(s)**

*In re Coca-Cola Products Marketing & Sales Practices Litigation*
 *(No. II)*,
 No. 20-15742, 2021 WL 3878654 (9th Cir. Aug. 31, 2021)..................57, 58, 59

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)......................................................................................3, 21

*Davidson v. Kimberly-Clark Corp.*,
 889 F.3d 956 (9th Cir. 2018) .....................................................................56, 57

*Davis-Miller v. Automobile Club of Southern California*,
 134 Cal. Rptr. 3d 551 (Ct. App. 2011) ...........................................................34

*Decker v. GlenFed, Inc. (In re GlenFed, Inc. Securities Litigation)*,
 60 F.3d 591 (9th Cir. 1995) ............................................................................32

*Downey v. Public Storage, Inc.*,
 258 Cal. Rptr. 3d 290 (Ct. App. 2020) ......................................................28, 30

*Fair Employment Council of Greater Washington, Inc. v. BMC*
 *Marketing Corp.*,
 28 F.3d 1268 (D.C. Cir. 1994).........................................................................60

*Fairbanks v. Farmers New World Life Insurance Co.*,
 128 Cal. Rptr. 3d 888 (Ct. App. 2011) ............................................................30

*Fait v. Regions Financial Corp.*,
 655 F.3d 105 (2d Cir. 2011) ............................................................................27

*First Nationwide Bank v. Gelt Funding Corp.*,
 27 F.3d 763 (2d Cir. 1994) ..............................................................................27

*Ganino v. Citizens Utilities Co.*,
 228 F.3d 154 (2d Cir. 2000) ............................................................................28

*Graham v. Bank of America, N.A.*,
 172 Cal. Rptr. 3d 218 (Ct. App. 2014) ............................................................25

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014).........................................................................................37

**Page(s)**

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ........................................................ 50, 54

*Harnish v. Widener University School of Law*,
  833 F.3d 298 (3d Cir. 2016) ................................................................ 44

*Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.)*,
  471 F.3d 977 (9th Cir. 2006) ............................................................... 23

*Hinesley v. Oakshade Town Center*,
  37 Cal. Rptr. 3d 364 (Ct. App. 2005) ................................................. 37

*IntegrityMessageBoards.com v. Facebook, Inc.*,
  No. 18-cv-05286, 2021 WL 3771785 (N.D. Cal. Aug. 24, 2021) ......... 29, 40

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) ............................................................. 21

*Kaldenbach v. Mutual of Omaha Life Insurance Co.*,
  100 Cal. Rptr. 3d 637 (Ct. App. 2009) ............................................... 33

*Kline v. Wolf*,
  702 F.2d 400 (2d Cir. 1983) .......................................................... 53, 54

*Knapp v. AT&T Wireless Services, Inc.*,
  124 Cal. Rptr. 3d 565 (Ct. App. 2011) ............................................... 34

*Kwikset Corp. v. Superior Court*,
  246 P.3d 877 (Cal. 2011) .............................................................. 28, 32

*Lanovaz v. Twinings North America, Inc.*,
  726 F. App'x 590 (9th Cir. 2018) ....................................................... 58

*Lara v. First National Insurance Co. of America*,
  25 F.4th 1134 (9th Cir. 2022) ....................................................... 25, 42

*Laufer v. Looper*,
  22 F.4th 871 (10th Cir. 2022) ............................................................ 56

**Page(s)**

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)..................................................................58, 60

*Mazza v. American Honda Motor Co.*,
 666 F.3d 581 (9th Cir. 2012) ...............................................18, 30, 33

*McLaughlin v. American Tobacco Co.*,
 522 F.3d 215 (2d Cir.), *abrogated on other grounds by Bridge v.*
 *Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) .......................43

*McManus v. Fleetwood Enterprises, Inc.*,
 320 F.3d 545 (5th Cir. 2003) .............................................................36

*McNair v. Synapse Group Inc.*,
 672 F.3d 213 (3d Cir. 2012) .........................................................55, 59

*Miller v. Gammie*,
 335 F.3d 889 (9th Cir. 2003) ..............................................................56

*Mirkin v. Wasserman*,
 858 P.2d 568 (Cal. 1993) ........................................................... *passim*

*Moore v. PaineWebber, Inc*,
 306 F.3d 1247 (2d Cir. 2002) ......................................................23, 24

*Moser v. Benefytt, Inc.*,
 8 F.4th 872 (9th Cir. 2021) .................................................................55

*O'Connor v. Uber Technologies, Inc.*,
 904 F.3d 1087 (9th Cir. 2018) ..............................................................4

*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets*
 *Corp.*,
 68 Cal. Rptr. 3d 828 (Ct. App. 2007) ...........................................41, 42

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods*
 *LLC*,
 31 F.4th 651 (9th Cir. 2022) .................................21, 22, 25, 35, 36

*Philip Morris USA Inc. v. Scott*,
 561 U.S. 1301 (2010)..........................................................................37

vii

**Page(s)**

*In re POM Wonderful LLC*,
  Nos. ML 10-2199, et al., 2014 WL 1225184 (C.D. Cal. Mar. 25,
  2014) ................................................................................................43

*Reitman v. Champion Petfoods USA, Inc.*,
  830 F. App'x 880 (9th Cir. 2020) ...............................................24, 32

*San Diego County Gun Rights Committee v. Reno*,
  98 F.3d 1121 (9th Cir. 1996) ........................................................4, 58

*Savino v. Computer Credit, Inc*.,
  164 F.3d 81 (2d Cir. 1998) ................................................................51

*Singh v. Google LLC*,
  No. 16-cv-03734, 2022 WL 94985 (N.D. Cal. Jan. 10, 2022) ...........40

*Small v. Fritz Cos.*,
  65 P.3d 1255 (Cal. 2003) ............................................................25, 32

*Snake River Farmers' Association v. Department of Labor*,
  9 F.3d 792 (9th Cir. 1993) .................................................................59

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011), *abrogated on other grounds by
  Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ...............19, 50, 51, 53

*Stover v. Experian Holdings, Inc.*,
  978 F.3d 1082 (9th Cir. 2020) ...........................................................59

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009)............................................................................59

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021)...............................................4, 20, 55, 56, 57

*Trichell v. Midland Credit Management, Inc.*,
  964 F.3d 990 (11th Cir. 2020) ......................................................55, 56

*Tucker v. Pacific Bell Mobile Services*,
  145 Cal. Rptr. 3d 340 (Ct. App. 2012) .............................................28

**Page(s)**

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)...............................................................23, 36

*United Food & Commerical Workers Unions & Employers Midwest*
    *Health Benefits Fund v. Warner Chilcott Ltd. (In re Asacol*
    *Antitrust Litigation)*,
    907 F.3d 42 (1st Cir. 2018)...............................................................42

*Vasquez v. Superior Court*,
    484 P.2d 964 (Cal. 1971)...............................................................34

*In re Vioxx Class Cases*,
    103 Cal. Rptr. 3d 83 (Ct. App. 2009) ...............................................35

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...............................................21, 29, 37, 48

*Walker v. Life Insurance Co. of the Southwest*,
    953 F.3d 624 (9th Cir. 2020) ...............................................22, 33

*West v. JPMorgan Chase Bank, N.A.*,
    154 Cal. Rptr. 3d 285 (Ct. App. 2013) ...............................................25

*Woolley v. Ygrene Energy Fund Co.*,
    No. 20-16608, 2021 WL 4690971 (9th Cir. Oct. 7, 2021)...............................25

## STATUTES

28 U.S.C. § 1292(e) ...............................................................4

28 U.S.C. § 1332(d)(2)...............................................................4, 5

28 U.S.C. § 2072(b) ...............................................................23, 35

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(a)(4)...............................................................50

Fed. R. Civ. P. 23(b)(3)...............................................................21, 23

Fed. R. Civ. P. 23(f)...............................................................5

1 *McLaughlin on Class Actions* § 5.55 (18th ed., 2021 update)...............................................................43

ix

**Page(s)**

*Oxford English Dictionary* (2d ed. 1989, online) ...................................................27

## INTRODUCTION

This appeal arises from an unprecedented effort to certify a damages class under Federal Rule of Civil Procedure 23(b)(3), involving hundreds of millions of unique alleged misrepresentations made to millions of diverse class members. This Court rightly granted Rule 23(f) review of a decision that threatens to open the door to virtually limitless fraud classes. That decision should now be reversed.

At issue in this case is an individually tailored estimate known as "Potential Reach," which Defendant Meta Platforms, Inc. ("Meta") provided to advertisers on its ad creation interface, Ads Manager. Advertisers can use Potential Reach as one of several planning tools to help them design their ad campaigns. Specifically, Potential Reach provides an "estimate" of the potential size of the overall target audience for an ad, based on unique targeting criteria selected for each ad by each advertiser. Potential Reach estimates are derived through statistical sampling and modeling, and Meta has long disclosed that Potential Reach is an estimate that is not designed to match population or census data. *See* 2-ER-176. Plaintiffs nevertheless contend that these Potential Reach estimates were misleadingly "inflated" due to the presence of fake and duplicate accounts and that they thus exceeded the number of actual people in the target audience. But Plaintiffs concede that each advertiser received a different Potential Reach estimate for each ad they ran and, critically, that the *degree* of alleged "inflation" in each estimate varied substantially.

1

That variance in the statements that the class members viewed should have precluded certification. The core question in a fraud action is whether a plaintiff detrimentally relied on a statement that was materially misleading. Here, that requires asking whether the degree of inflation in each class member's Potential Reach estimate was materially misleading and whether each advertiser relied on, and suffered injury as a result of, that particular degree of inflation. But whether an "estimate" that is off by 1 or 2% is materially misleading is a fundamentally different inquiry than whether an estimate inflated by 50% is materially misleading. Yet that is precisely the diverse array of statements that will be submitted to the jury, without any clear way of establishing falsity, materiality, reliance, or injury on a class-wide basis. That problem is compounded by the substantial differences between the millions of advertisers in the class, who range from sole proprietors to multinational corporations to governments, and who viewed different disclosures, had different objectives, and had access to vastly different information and context for the estimates they saw. There is simply no plausible way of establishing reliance and resulting injury for that diverse array of advertisers through common proof. To the contrary, Plaintiffs' own expert found that *over a fifth* of advertisers likely did *not* detrimentally rely on Potential Reach estimates. Determining which class members relied on which representations will thus necessarily involve individualized inquiries that preclude certification.

The district court ignored these fundamental problems and certified a Rule 23(b)(3) damages class of over three million advertisers, with little over four pages of analysis on the key predominance issues in the case. The district court expressly acknowledged that the statements here varied in the very aspect that is alleged to be misleading—the "discrepancy" between the number of accounts and number of people who might meet an advertiser's targeting criteria—but found that variation *irrelevant* because there was purportedly at least some inflation in all estimates, and Potential Reach was an "important number." 1-ER-11–13. That reasoning simply ignores the material variations within the class and would permit certification in virtually any instance where a common theory of misconduct is alleged, blurring Rule 23(a)'s commonality requirement with Rule 23(b)(3)'s "more demanding" predominance standard. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). The district court's certification decision cannot stand for this reason alone.

But the decision below should also be reversed for two additional reasons related to the putative class representatives. *First*, certification should have been denied as to both the Rule 23(b)(2) and 23(b)(3) classes because the named Plaintiffs are atypical and inadequate class representatives. They have made contradictory and dishonest representations, which give rise to unique defenses that will distract from and undermine the claims of the rest of the class. The district court ignored this Court's precedents by declining to address these serious credibility problems.

3

*Second*, the district court erred by certifying a class under Rule 23(b)(2) for purposes of Plaintiffs' Unfair Competition Law claim because the class representatives lack Article III standing to pursue injunctive relief. Plaintiffs' only allegation of prospective harm is that they would not be able to trust Meta's representations if they were to buy Meta ads again. But the Supreme Court's recent decision in *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021), squarely forecloses pursuing injunctive relief for that kind of purely informational harm. And, in any event, neither named Plaintiff can show their asserted future injury is imminent, because, by their own admission, they have no "concrete plans" to buy Meta ads in the future, even if Potential Reach estimates are altered or removed. *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996) (citation omitted). The certification decision warrants reversal for both of these reasons as well.

## STATEMENT OF JURISDICTION

On March 29, 2022, the district court issued an order certifying the class at issue. 1-ER-2. The district court had subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2). On April 12, 2022, Meta timely petitioned for permission to appeal the class certification order under Rule 23(f). 2-ER-199–231. This Court granted the petition on June 21, 2022. 2-ER-197–98. This Court has jurisdiction to review the district court's class certification order pursuant to 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f), *see O'Connor v. Uber*

*Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018), and subject matter jurisdiction under 28 U.S.C. § 1332(d)(2).

## STATEMENT OF THE ISSUES

1. Whether Plaintiffs fail to satisfy Rule 23(b)(3)'s predominance requirement for purposes of their fraud claims because class members were purportedly exposed to varying degrees of alleged inflation in their unique Potential Reach estimates, and made their decisions based on differing objectives and information and having seen different disclosures.

2. Whether the named Plaintiffs (a) fail to satisfy typicality and adequacy because their serious credibility problems will give rise to unique defenses and derail any class trial; and (b) lack Article III standing to represent the Rule 23(b)(2) injunctive-relief class because they assert only an "informational" injury and have no intent to purchase Meta advertisements in the future.

## STATEMENT OF ADDENDUM

The relevant constitutional and statutory provisions are set forth in the addendum filed concurrently with this brief. *See* 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.    Factual Background

"Potential Reach" is one of several planning tools Meta displays to help advertisers target their ads to an interested audience.  It is a "unique calculation" that provides an individualized numerical "estimation of how many people are in an ad set's target audience" through statistical sampling and modeling.  2-ER-82–83; *see also* 2-ER-159.  A default Potential Reach estimate is displayed in Ads Manager, Meta's self-service ad creation interface, during the ad creation process, and the estimate of Potential Reach then updates dynamically in real time as an advertiser selects from hundreds of thousands of targeting and placement criteria, like demographics (*e.g.*, age, gender, location), interests (*e.g.*, dogs, the San Francisco 49ers), and where the ads should be shown (*e.g.*, Facebook, Instagram).  *See* 4-ER-422–24.  Potential Reach estimates are different for each ad campaign because the particular targeting and placement criteria selected by the advertiser for each separate ad campaign determine the Potential Reach estimate at that particular point in time.  5-ER-520, 531–34, 581; 4-ER-422–24, 428–29, 509; 2-ER-149–50; 5-ER-666–68.

6

Potential Reach is "not an estimate of how many people will actually see [an advertiser's] ad" or how many people may click on it or take any other action with respect to it.  2-ER-177–79; 2-ER-158.  Those estimates are provided by *separate* metrics called Estimated Daily Results, including Estimated Daily Reach, which are presented adjacent to Potential Reach and (unlike Potential Reach) take into account adjustments to an advertiser's budget, as well as past ad performance.  2-ER-158, 163.



2-ER-157

In essence, Potential Reach estimates the initial outer boundary for how many people might meet an ad's targeting criteria.  But because advertisers have limited ad budgets that preclude delivery of their ads to anywhere close to that outer boundary, Potential Reach is not directly related to how many actual human eyes will view a specific ad.  That is why advertisers also look to other estimates such as Estimated Daily Results (which takes into account their budgets) when planning their campaigns.  *See generally* 2-ER-94–146 (advertiser declarations); 5-ER-517, 5-ER-535–37, 5-ER-540–41.

After setting the parameters for their ad campaigns, advertisers purchase ad slots through Meta's competitive ad auctions. These auctions occur each time "there is an opportunity (ad slot) to show a Facebook user an ad" (*e.g.*, when a user opens Facebook on her phone), and the auctions are held continuously in real time, such that there are "billions of auctions each day." 4-ER-476. Meta's auction system is unique because it does not simply respond to the amount of each advertiser's bid, but instead aims to "provide a higher-quality experience for users" by taking into consideration ad quality in determining winners and prices. *See* 4-ER-484, 488–89. Winners are selected for each ad slot based on numerous factors, including the unique combination of advertisers competing for a particular ad slot, each advertiser's bid amount, and the quality of each advertiser's ad. 4-ER-484–94; 2-ER-153–54. Each ad slot is likewise individually priced, and the price paid for an ad slot is *not* necessarily the winning bidder's bid, but instead depends on various factors, including ad quality and the bids of other advertisers in the auction. *See* 4-ER-484–85. As a result, "[a]n advertiser's budget and bid are not the sole determinants of who wins an auction and the prices paid," 4-ER-501, and ad prices vary significantly across auctions. 5-ER-559–60, 568, 570–71, 574, 582; 4-ER-492, 499–501, 503–05, 510–11.

Once an ad launches, advertisers can track their actual results in real time, including the number of impressions that reach the intended audience and the

number of times the ad was clicked on. 2-ER-169–73; 5-ER-517, 525, 536–37.
Those metrics help advertisers understand their campaigns' actual success and return
on investment, allowing them to immediately adjust their budgets for future ad
purchases. *See* 5-ER-526–27, 557–58. Advertisers are not shown Potential Reach
estimates as part of those results, and are not charged based on Potential Reach. *See
generally* 2-ER-169–73; 5-ER-525. Additionally, the vast majority of advertisers
are focused on "objectives" (*i.e.*, goals for their ad campaigns) like "conversions"
(*i.e.*, the number of times users take a desired action, like clicking through to another
website), not just "reach" or "brand awareness" (*i.e.*, how many people might simply
view, but not click on, the ads). *See* 5-ER-528–31; *see also* 4-ER-406–07.

Throughout the Class Period, Meta sought to ensure that Potential Reach
estimates reflected the best possible approximation of target audience size for a
given set of criteria. 4-ER-426–31, 433–44. For example, in 2019, Meta modified
Potential Reach to count only those people who had actually seen an ad in the last
30 days, rather than those who were active and *could* have seen an ad (but did not
necessarily receive one). 2-ER-192. Meta also continuously de-duplicates
Instagram accounts matched to Facebook accounts and counts them as one person
in Potential Reach estimates, 4-ER-365; 4-ER-161–63, and it removes billions of

9

fake and abusive accounts, including bot and spam accounts, every year, 4-ER-440–42.[1]

Despite these efforts, Potential Reach remains an *estimate* that does not always perfectly align with the actual number of people in an ad set's target audience. It is undisputed, however, that the degree of any discrepancy varies from estimate to estimate. That variation stems from the fact that the presence of "duplicate" accounts that could cause inflation differs depending on the interests, behaviors, and demographics targeted. For example, a user living in California may have one account focused on work interests and a separate account focused on personal interests, such as dogs. If an advertiser targets people living in California, the Potential Reach estimate will include both accounts. But if the advertiser targets people interested in dogs, the Potential Reach estimate will include only the personal account. *See* 2-ER-149–50; 4-ER-451–61.

As the targeting criteria narrow the ad's target audience, any potential inflation thus decreases. *See* 4-ER-457–58, 460 (Meta's expert explaining that "as advertisers use more detailed targeting criteria, [multiple accounts] typically decline substantially"); *see also* 4-ER-369–74 (similar). Accordingly, the degree to which

---

[1] Although Plaintiffs allege Meta should have taken other steps to address fake and duplicate accounts, Meta consistently sought to improve Potential Reach while declining to adopt purported solutions that would have made Potential Reach estimates "less precise." 2-ER-59–62.

an advertiser's Potential Reach estimate may be inflated (if at all) by virtue of duplicate or fake accounts depends on the particular targeting criteria selected. Meta's expert concluded that inflation was *de minimis* for targeted ad campaigns, 4-ER-457–60, 465–74, while Plaintiffs' expert contends that inflation was as low as 10% for certain class members and over 50% for others. *See* 5-ER-638–40; 5-ER-644–47.

Given the approximate nature of Potential Reach estimates, and the complexity of deduplication and elimination of fake accounts, Meta provides prominently placed disclosures regarding Potential Reach. In particular, Meta has long made clear that Potential Reach provides an "estimate" of target audience size, and those estimates are "not designed to match population or census estimates," but instead are "based on the placements and targeting criteria [an advertiser] select[s] and include factors like Facebook user behaviors," "self-reported age and gender" (which Meta cannot verify), and "[l]ocation data." 2-ER-176; *see also* 2-ER-82; 2-ER-181; 5-ER-532. Over time, Meta also provided additional disclosures, clarifying that estimates "may differ" depending on "[h]ow many accounts are used per person," 2-ER-177; 2-ER-183; that actions taken on separate accounts "may be counted separately even though they were made by the same person," 2-ER-178; and that "the presence of fake accounts may have some impact" on metrics like Potential Reach estimates, 2-ER-179.

**B.     Procedural Background**

In 2018, Plaintiffs filed suit, alleging that the Potential Reach estimates that Meta presented were "inflated," because they exceeded the actual number of people in an ad set's target audience. *See generally* Class Action Compl., Dkt. 1; *see also* 2-ER-80, 89, 92 (operative complaint).   Plaintiffs alleged that these "inflated" estimates materially misled advertisers into increasing their advertising budgets, and thus "distorted the market price" for advertisements. *See* 2-ER-88.

Following motion practice and the filing of several amended complaints, the district court allowed Plaintiffs to proceed on three state-law claims: (1) fraudulent misrepresentation, (2) fraudulent concealment, and (3) a claim for injunctive relief under the California Unfair Competition Law ("UCL"). *See* 2-ER-194–96; 2-ER-47–48.   Each of these claims turns on Meta's alleged misrepresentations and omissions with respect to Potential Reach.

Plaintiffs sought to certify an ever-expanding class of millions of advertisers who purchased any ads through Meta's Ads Manager at any time from August 2014 to the present. *See generally* 5-ER-599–632.   Members of the class range from sole proprietors and local businesses, to government entities, to multinational corporations and Fortune 500 companies.   It is undisputed that members of this broad class differ in a variety of ways, such as the objectives they use for their advertising campaigns, whether they have metrics and data from past advertising campaigns to

12

inform their future decisions, and whether they use professional consultants or ad agencies in making their purchasing decisions. *See* 5-ER-522–42.

The class representatives, DZ Reserve and Maxwell, are two former Meta advertisers. DZ Reserve was an ecommerce drop-shipping business (*i.e.*, a business that acts as a middle-man selling products manufactured and shipped by a third party) owned and operated by Daniel Ziernicki that spent $1 million on 26,000 Meta ads from December 2017 to December 2018, earning at least $1.9 million in sales as a result. 5-ER-543, 561–63, 583–84, 590; 2-ER-90. Maxwell is a security contractor who sold firearm mounts on Amazon and, from September 2018 to May 2019, spent $379 on 28 Meta ads that generated at least $1,000 in sales. 2-ER-22–23; 5-ER-549, 563–66, 591, 595–98; 2-ER-90–91. Neither DZ Reserve nor Maxwell are currently operating their businesses. *See* 3-ER-295 (DZ Reserve); 2-ER-42, 46 (Maxwell).

Meta opposed class certification. Among other things, Meta explained that Plaintiffs could not satisfy Rule 23(b)(3)'s predominance requirement because each class member viewed a fundamentally different statement, which varied in the very aspect alleged to be misleading, and the class varied along a number of other relevant dimensions—including the disclosures about Potential Reach that advertisers may have viewed, the advertisers' objectives for each particular ad campaign, and the mix of information each advertiser had access to. 4-ER-342–47. Meta also

explained that the named Plaintiffs were atypical and inadequate in light of evidence contradicting their claims of reliance on Potential Reach. 4-ER-340–41.

On March 29, 2022, without hearing oral argument, the district court certified one of the largest fraud classes in the history of this Circuit. 1-ER-2–18. The court first held that Plaintiffs satisfied the typicality and adequacy requirements based on their claim that "they would have spent less on ads" had they known that Potential Reach estimates were "inaccurate." 1-ER-7–8. The court did not address, or even acknowledge, Meta's argument that Plaintiffs were subject to unique defenses and had testified untruthfully, which rendered them incompetent to represent the class.

Next, the court held that the class satisfied Rule 23(b)(3)'s predominance requirement for the fraud claims. The court did not separate out its analysis of commonality and the "'more demanding'" predominance standard, but found generally that "the main liability issues are common to the class members and are capable of resolution with common evidence." 1-ER-10 (citation omitted). The court stated that "all class members were exposed to a similar representation about the ability of Potential Reach to reach 'people,'" but "the number of unique accounts and unique people were different, [which] led to an inaccurate representation of how many people the advertisements could reach." 1-ER-11. The court acknowledged Meta's argument that "the Potential Reach numbers were not uniformly inaccurate as a result of different targeting criteria producing different Potential Reach

14

numbers." *Id.* But the court found this irrelevant because "the discrepancy between people and accounts made the number inaccurate, even if the numerical value of the inaccuracy"—*i.e.*, the degree of this discrepancy—"*varied* across advertisers." *Id.* (emphasis added). Without assessing whether this acknowledged variance would impact whether the "estimates" were in fact false or materially misleading (particularly given Meta's disclosures), the court summarily concluded that "plaintiffs have shown that the question of whether Meta made misrepresentations to all class members can be shown through common evidence." *Id.*

The court then assessed "materiality and reliance" in a single paragraph. *Id.* It stated that "materiality and reliance" do "not necessarily undermine predominance" in fraud cases, because a "'presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material.'" 1-ER-11–12 (citation omitted). Without assessing whether such a presumption was warranted in this case, the court concluded that materiality and reliance could be established "through common evidence" because "Potential Reach metrics were shown to all advertisers," it was "an important number for advertisers," and "[a] majority of advertisers rely on Potential Reach as a metric for their advertisements." 1-ER-12. The court did not explain how materiality could be addressed on a class-wide basis in light of the different statements—*i.e.*, the widely varying levels of alleged inflation—each class member was exposed to. Nor did the court address the

individualized defenses that might arise from the significant differences between advertisers, the varying disclosures and contextual information they may have seen, and the disparate importance to them of an admitted estimate.

The court next found injury could be proven by common evidence because of the existence of *some* inflation in the estimates. *Id.* The court recognized a dispute between the parties' experts as to the degree and uniformity of inflation across estimates, but deemed it immaterial, because Meta's expert "did not conclude that no inflation occurred at all." 1-ER-12–13.

Finally, as to damages, the court concluded that Plaintiffs could calculate damages on a class-wide basis using a "price premium" theory propounded by one of their damages experts. 1-ER-13–14. Under that theory, it did not matter that some advertisers may not have relied on or even seen the Potential Reach metric, because some unknown subset of advertisers would have been willing to pay more, thus purportedly raising the auction price of all ads. 1-ER-13.

The court additionally certified a Rule 23(b)(2) class to resolve Plaintiffs' UCL claim for injunctive relief, based on the premise that Plaintiffs "will be unable to trust Meta's representations going forward." 2-ER-48; *see* 1-ER-17.

This Court granted Meta's Rule 23(f) petition for review. 2-ER-197–98.

## SUMMARY OF ARGUMENT

I. The district court erred in certifying a sprawling class of millions of advertisers for purposes of Plaintiffs' fraud claims. Fraud claims are frequently ill-suited to class treatment because they turn on the particular content of the challenged representations and the way in which each recipient receives and reacts to those representations. For that reason, courts recognize that fraud classes may be certified only where the class has been exposed to substantially similar statements, such that the jury may resolve liability for all members of the class by evaluating only the circumstances of the named plaintiffs.

That is plainly not the case here. Plaintiffs allege that Potential Reach estimates were "inflated" by the discrepancy between the number of people and accounts in an ad set's target audience. But Plaintiffs concede that the degree of alleged inflation *varied* by (in their own calculation) at least a factor of five among the estimates shown to the class, and those estimates were displayed alongside evolving disclosures and tailored Estimated Daily Reach estimates that further altered the mix of information each advertiser received. Whether each individual Potential Reach estimate, read alongside the applicable disclosures and Estimated Daily Reach estimate, was, in fact, materially misleading is an individualized question that is not susceptible to class-wide proof. *See Berger v. Home Depot USA,*

17

*Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017).

Nor is there a way of resolving on a class-wide basis whether each of the millions of class members actually relied on the unique representation they saw, and suffered an injury as a result. No presumption of reliance applies in this case because the class was not exposed to uniform material misrepresentations. Adjudication of the claims of the class will instead require individualized reliance inquiries, which are well-understood to preclude class certification. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012). And those inquiries are likely to be especially challenging in this case, because the class ranges from major Fortune 500 companies to sole proprietorships, with differing objectives for their advertising campaigns and access to vastly different information (ranging from sophisticated professional advice, to online tutorials, to past campaign results) in making their purchasing decisions.

Moreover, Plaintiffs' effort to demonstrate class-wide injury via a "price premium" theory is also flawed. That theory assumes a perfectly efficient market, where alleged misstatements translate into an across-the-board price increase for all advertisers—including for those who did not rely on, or even see, those statements. But courts have long rejected importing the efficient-market assumption used for securities cases even into the traditional consumer fraud context. And such an

18

assumption is particularly unwarranted here, given the highly individualized and unique nature of Meta's ad auctions.

Despite all these flaws, the district court certified one of the largest fraud classes in this Court's history. The district court's cursory order offers no explanation—let alone justification—for the enormous class it certified. The district court claimed that both "predominance and commonality" were satisfied, simply because Potential Reach was an "important" metric to advertisers that was "inaccurate" across the board. 1-ER-11–12. But even if that were true, it ignores the fundamental sources of differentiation that make this case unsuitable for Rule 23(b)(3) treatment. The district court's approach defies this Court's precedent, and opens the door to certifying vastly oversized fraud classes, without regard to the efficiency and procedural fairness that Rule 23(b)(3) certification demands.

II. The district court's certification of both the Rule 23(b)(2) and (b)(3) classes was also improper because the named Plaintiffs suffer from two fundamental defects. *First*, the named Plaintiffs do not satisfy Rule 23(a)'s requirements of adequacy and typicality because Plaintiffs provided contradictory and unsupported testimony about a central element of their claims. This Court and appellate courts around the country have denied class certification when named plaintiffs lack credibility on key issues that could divert attention from the claims of absent class members. *See, e.g.*, *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019-20 (9th Cir.

2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). The district court ignored Meta's arguments on these points, effectively deferring any assessment of credibility to the merits stage. That contravenes circuit precedent and the core purposes of the adequacy and typicality requirements, which are designed to ensure such credibility issues do not jeopardize the interests of absent class members. That is reason alone to overturn the district court's certification of both the Rule 23(b)(2) and (b)(3) classes.

*Second*, Plaintiffs lack Article III standing to seek injunctive relief, which is a prerequisite to certification of the Rule 23(b)(2) class. Plaintiffs do not allege that they will "incur additional damages" in the future, but merely that they "will be unable to trust Meta's representations going forward." 2-ER-48; *see also* 1-ER-17. That injury falls far short of establishing Article III standing under the Supreme Court's recent decision in *TransUnion*, 141 S. Ct. at 2214. And, in any event, Plaintiffs' injury is not "actual or imminent" because they both admittedly have no concrete plans to re-enter the market for Meta ads. *See Bain v. Cal. Teachers Ass'n*, 891 F.3d 1206, 1214 (9th Cir. 2018) (citation omitted).

These fundamental defects warrant reversal of the class certification order.

## STANDARD OF REVIEW

This Court reviews the decision to certify a class for abuse of discretion, but reviews "the district court's determination of underlying legal questions de novo,"

20

and "its determination of underlying factual questions for clear error." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc).

## ARGUMENT

## I. THE CLASS DOES NOT SATISFY RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT

### A. Fraud Claims Satisfy Predominance Only In Narrow Circumstances

Rule 23(b)(3) is "an 'adventuresome innovation,'" that permits the aggregation of claims where "class-action treatment is not as clearly called for." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011) (citations omitted). Specifically, Rule 23(b)(3), unlike Rule 23(b)(2), contemplates certification for purposes of damages actions, and thus requires that the impact upon class members—and not just the defendant's alleged wrongdoing—can be established through common proof "without sacrificing procedural fairness." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

To ensure that Rule 23(b)(3) classes are certified only in such circumstances, Rule 23(b)(3) includes a "demanding" predominance requirement, which mandates that a party seeking certification must show that "questions affecting only individual members" do not predominate over questions common to the class. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (quoting Fed. R. Civ. P. 23(b)(3)); *see Just Film, Inc. v. Buono*, 847 F.3d 1108, 1115, 1120 (9th Cir. 2017) (same). This

requirement is aimed at ensuring that any putative class is "sufficiently cohesive to warrant adjudication by representation." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) (citation omitted).

Where a jury's conclusion as to one plaintiff's claim would not resolve the claims of the rest of the class, class certification provides neither the efficiencies contemplated by Rule 23(b)(3), nor the "procedural fairness" that is indispensable to certification. *Amchem*, 521 U.S. at 615. The predominance inquiry thus begins "with the elements of the underlying cause of action," and requires plaintiffs to show "that 'essential elements of the cause of action,' . . . are capable of being established through a common body of evidence, applicable to the whole class." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665-66 (9th Cir. 2022) (en banc) (citation omitted).

It has long been acknowledged that fraud claims are typically unsuited for class treatment because they turn on the specific content of an alleged misrepresentation and whether that representation induced reliance in a particular person. As the Advisory Committee explained in its notes to the 1966 Amendment to Rule 23, even where a fraud case has "some common core" of alleged wrongdoing, it "may be unsuited for treatment as a class action" because of "material variation in the representation made or in the kinds or degrees of reliance by the

persons to whom they were addressed." Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment.

Those limitations reflect common sense. After all, a jury's conclusion that one representation is materially misleading to one person typically will not establish that a *different* representation is materially misleading to a *different* person. Aggregating plaintiffs subject to different representations thus threatens to relieve plaintiffs of their burden to prove the essential elements of fraud and to deprive defendants of their right to litigate individual defenses, in violation of the Rules Enabling Act and due process. *See* 28 U.S.C. § 2072(b) (Rule 23 may not enlarge or abridge the substantive rights of the parties); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458-59 (2016) (noting that evidence that could not establish liability in each class member's individual case likewise cannot establish liability in a class action).

Thus, while minor or trivial differences in statements—such as an oral "standardized sales pitch" that might change in small ways based on who is speaking—do not necessarily preclude certification, *see Henry v. Lehman Com. Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977, 991 (9th Cir. 2006), courts routinely reject class certification of fraud claims "[w]here there are material variations in the nature of the misrepresentations made to each member of the proposed class," *Moore v. PaineWebber, Inc*, 306 F.3d 1247, 1253 (2d Cir. 2002).

In such circumstances, "class certification is improper because plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations in order to sustain their claims." *Id.*; *see also Reitman v. Champion Petfoods USA, Inc.*, 830 F. App'x 880, 881 (9th Cir. 2020) (affirming denial of class certification where determining whether representations were misleading would require "separately examining" each package containing "different information"); *Carrera v. First Am. Home Buyers Protection Co.*, 702 F. App'x 614, 614 (9th Cir. 2017) (affirming denial of class certification where defendants "did not make uniform representations to the members of the putative class"); *cf. Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017) (affirming denial of class certification for UCL claim where determining whether class members were exposed to "a potentially misleading or deceptive statement" would require "an independent legal analysis" of varying contracts).

This case is *far* outside the narrow circumstances in which fraud claims may be certified. It involves claims by a diverse array of class members challenging millions of individually tailored statements that vary in the *very aspect* alleged to be misleading—*i.e.*, the alleged disparity between the unique Potential Reach estimate displayed to each advertiser each time they selected new targeting criteria for each

24

ad and the number of unique individuals in each target audience. Tellingly, Plaintiffs have been unable to identify *any* case in any circuit where a fraud class has been certified in remotely similar circumstances. The district court's decision thus extends Rule 23(b)(3)'s "adventuresome innovation" into uncharted territory.

### B. Predominance Is Lacking Because The Claims Of Differently Situated Class Members, Exposed To Different Representations, Cannot Be Evaluated Through Common Evidence

To satisfy Rule 23(b)(3), Plaintiffs were required to show that the "essential elements" of their fraud claims were susceptible to class-wide proof. *Olean*, 31 F.4th at 665-66 (citation omitted). That means that each of the following elements must be capable of being proven as to every class member without the need for individualized inquiries: (1) a material misrepresentation (2) that the class member actually and justifiably relied on, (3) such that they suffered resulting injury. *See, e.g.*, *Small v. Fritz Cos.*, 65 P.3d 1255, 1258 (Cal. 2003); *Graham v. Bank of Am., N.A.*, 172 Cal. Rptr. 3d 218, 228 (Ct. App. 2014); *West v. JPMorgan Chase Bank, N.A.*, 154 Cal. Rptr. 3d 285, 295 (Ct. App. 2013). Far from showing that they could satisfy *all* of these elements on a class-wide basis, Plaintiffs can satisfy *none*.

Each one of those deficiencies *alone* would be sufficient to preclude certification. *See, e.g.*, *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1138 (9th Cir. 2022) (finding predominance lacking where a single element—proof of injury—would require "an individualized determination for each plaintiff"); *Woolley v.*

*Ygrene Energy Fund Co.*, No. 20-16608, 2021 WL 4690971, at *1-2 (9th Cir. Oct. 7, 2021) (finding predominance lacking where reliance would require individualized inquiries). Taken together, they reflect a case plainly unsuited for class treatment.

### 1. *Falsity and materiality cannot be proven on a class-wide basis*

Plaintiffs cannot show falsity or materiality with common proof, because the representations at issue vary in two critical respects. *First*, the degree of alleged inflation in each Potential Reach estimate—the core misrepresentation Plaintiffs challenge—varied substantially between class members. *Second*, those estimates were displayed alongside disclosures that evolved throughout the Class Period, as well as tailored Estimated Daily Reach estimates that reflected how many people were actually estimated to see that advertiser's ad (as opposed to merely meeting targeting criteria). Whether a particular statement is materially misleading will thus turn on whether that statement sufficiently inflated the "true" value in such a way that it would have misled an ordinary person, in light of the relevant disclosures and the Estimated Daily Reach estimate. That is an individualized inquiry that precludes class certification.

1. The crux of Plaintiffs' theory is that Meta's Potential Reach estimates were inflated because, although they were stated in terms of "people," they were actually estimates of the "accounts" in an ad set's target audience, which was purportedly higher than the number of "unique people." *See* 1-ER-11; 2-ER-79–80, 82–88. But,

as Plaintiffs conceded and the district court itself recognized, "the numerical value" of the "discrepancy between people and accounts . . . *varied across advertisers*." 1-ER-11 (emphasis added); *see* 5-ER-619–20. In particular, Meta's expert explained that the degree of alleged inflation varies substantially depending on the size of the target audience, and inflation for more targeted ad campaigns is *de minimis*. 4-ER-457–60, 465–74. Plaintiffs' expert likewise acknowledged that "inflation level" differs depending on the size of the group the advertiser chooses to target, and he asserted that the level of inflation varied by a *factor of five*—with inflation being as low as 10% for certain class members, and over 50% for others. *See* 5-ER-638–40; *see also* 5-ER-644–46.

The *degree* of inflation is critical to whether a particular statement is or is not materially misleading. Meta expressly described Potential Reach as an "estimate," and whether an estimate is a false statement turns on how far that estimate departs from the "true" value. *See* Estimate, *Oxford English Dictionary* (2d ed. 1989, online) ("An *approximate* judgment based on considerations of probability, respecting the number, amount, magnitude, or position of anything . . . ." (emphasis added)); *cf. Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (explaining that an imprecise "estimate" is not necessarily false or misleading, because "estimates will vary depending on a variety of predictable and unpredictable circumstances"); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769-70 (2d Cir. 1994)

27

(holding that proximate cause for fraud-based claim depended on "magnitude" by which alleged misrepresentations overstated the value of properties); *Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1052 (5th Cir. 1992) (holding that "estimate" of property taxes was not a false representation in part because an estimate is a "'rough or approximate calculation'" (citation omitted)).

If the difference between "accounts" and "people" for a set of targeting criteria is sufficiently small, then Plaintiffs cannot show *any* misrepresentation for those ads, because an "estimate" does not become false by virtue of being inexact. And, even where the alleged inflation is more than *de minimis*, whether or not the inflation is material will turn on the particular degree of inflation in each estimate. A misrepresentation is material only if a reasonable person "would attach importance" to it "in determining his [or her] choice of action." *Downey v. Pub. Storage, Inc.*, 258 Cal. Rptr. 3d 290, 300 (Ct. App. 2020) (alteration in original) (quoting *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 892 (Cal. 2011)); *Tucker v. Pac. Bell Mobile Servs.*, 145 Cal. Rptr. 3d 340, 362 (Ct. App. 2012). A trier of fact can only find liability as to a particular class member if the statement *that* class member saw was materially misleading. And it is a fundamentally different inquiry to ask whether an "estimate" that is allegedly inflated by 5-10% is materially misleading than it is to ask the same question with respect to an "estimate" that is 50% inflated. *Cf. Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir. 2000) (rejecting "bright-line test

for materiality" based on percentage benchmarks for inaccuracy of financial figures); *Auto. Indus. Pension Tr. Fund v. Textron Inc.*, 682 F.3d 34, 39 (1st Cir. 2012) (noting that "materiality . . . depend[s] importantly on matters of degree and detail"). A jury's conclusion as to one representation simply would not establish liability as to the other.

Plaintiffs' claims thus do not "depend upon a common contention," and determining the materiality of a particular degree of inflation will not "resolve an issue that is central to the validity of" each class member's claims "in one stroke." *Dukes*, 564 U.S. at 350. Rather, the only way to establish falsity and materiality for each of the different representations at issue is to conduct individualized inquiries, class-member by class-member, to determine whether the unique representation each class member saw was materially misleading. *See IntegrityMessageBoards.com v. Facebook, Inc.* ("*IMB*"), No. 18-cv-05286, 2021 WL 3771785, at *11-12, *14 (N.D. Cal. Aug. 24, 2021) (denying certification of class of Meta advertisers where it would be necessary to assess countless different statements and "identify which advertisers viewed which description to show exposure" to a misrepresentation).

2. The impossibility of showing falsity and materiality on a class-wide basis is compounded by the fact that advertisers saw their Potential Reach estimates alongside differing contextual information, including evolving disclosures and

personalized Estimated Daily Reach estimates. *First*, because contextual language must be considered in determining whether a statement is materially misleading, courts regularly find predominance lacking where the putative class has been exposed to different disclosures. In *Berger*, for example, this Court affirmed the denial of class certification where the defendant had used five different contracts, each of which "require[d] an independent legal analysis" to determine whether it sufficiently alerted the customer to the alleged deceptive practice at issue in the case. 741 F.3d at 1069. And in *Mazza v. American Honda Motor Co.*, this Court likewise held that a class could not be certified where, among other things, certain class members were likely told of the allegedly omitted information about a braking system before they made their vehicle purchases. 666 F.3d 581, 595-96 (9th Cir. 2012).[2]

Here, Meta has provided evolving disclosures throughout the Class Period that impact whether any given Potential Reach estimate was false or materially misleading. Early versions of Meta's disclosures explained that Potential Reach estimates are "not designed to match population or census estimates." 2-ER-176. In

---

[2]  *See also Downey*, 259 Cal. Rptr. 3d at 303 (holding that predominance was lacking where there was "variation in disclosures that directly affect[ed] whether the allegedly deceptive advertisements were, in fact, deceptive"); *Fairbanks v. Farmers New World Life Ins. Co.*, 128 Cal. Rptr. 3d 888, 906 (Ct. App. 2011) (holding that it was "impossible to consider the language of" the challenged insurance policies without also considering disclosures).

March 2019, Meta further clarified that estimates "may differ" depending on "[h]ow many accounts are used per person," indicating that estimates may not reflect the precise number of individual people in a target audience. 2-ER-177; 2-ER-183. And in March 2021, Meta specifically highlighted that "the presence of fake accounts" may impact Potential Reach estimates. 2-ER-179; 2-ER-185.

An advertiser purchasing ads in March 2021 would therefore have been expressly told that Potential Reach estimates may be impacted by variables like duplicate or fake accounts—the precise issue Plaintiffs challenge in this case— whereas an advertiser purchasing ads in 2017 would not have seen the same disclosures. The distinct disclosures thus require "an independent legal analysis" to determine whether each class member was exposed to an allegedly material misrepresentation in light of the particular disclosure they viewed. *Berger*, 741 F.3d at 1069. That analysis is unsuited to class certification.

*Second*, class members viewed their Potential Reach estimates alongside tailored Estimated Daily Reach estimates, which further altered the mix of information to which each advertiser was exposed. Estimated Daily Reach estimates how many people may actually see that advertiser's ad each day, and because it takes into account an advertiser's budget, such estimates are a small fraction of Potential Reach estimates. 5-ER-535–36; 4-ER-431–32. An advertiser may, for example, be shown a Potential Reach estimate of 4.6 million people but set a modest budget that

produces an Estimated Daily Reach of only 1,000-3,000 people. *See* 2-ER-165; *cf.* 5-ER-546; 2-ER-34–36. The trier of fact would have to determine whether the particular degree of alleged inflation in the Potential Reach estimate was material when presented alongside the drastically smaller audience the ad was actually predicted to reach. And the same analysis would have to be independently conducted for the particular Potential Reach and Estimated Daily Reach combination each class member viewed, defeating predominance. *See Reitman*, 830 F. App'x at 881.

### 2. *Actual reliance cannot be proven on a class-wide basis*

To make out their fraud claims, Plaintiffs must also show actual reliance. *See, e.g.*, *Small*, 65 P.3d at 1257; *Mirkin v. Wasserman*, 858 P.2d 568, 575 (Cal. 1993); *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 60 F.3d 591, 592 (9th Cir. 1995). Actual reliance is a subjective inquiry that asks whether a plaintiff *in fact* relied on a particular representation in choosing her course of action. That inquiry is inherently individualized, because it turns on the particular factors each class member found significant in making their purchasing decisions. *See Kwikset*, 246 P.3d at 890 n.14 (noting that inquiries into "a plaintiff's subjective motivations in making a purchase" are "a routine part of common law deceit actions"). For that reason, this Court has squarely held that the need for individualized inquiries into

32

reliance defeats predominance. *See, e.g.*, *Mazza*, 666 F.3d at 596; *see also Walker*, 953 F.3d at 630-31.

To avoid this substantial obstacle to class certification, Plaintiffs invoked a state-law "presumption" of reliance in the district court, and the court adopted that presumption without any analysis, concluding that reliance could therefore "be shown . . . through common evidence." 1-ER-12 (citation omitted). That was error for three independent reasons. *First*, California law is clear that a presumption of reliance attaches only when there is a *common* misstatement, which is precisely what is lacking here. *Second*, even if California law *would* apply the presumption in a state class action, the Rules Enabling Act bars its application in federal court. *Third*, even if the presumption *could* somehow apply here, Meta would still be entitled to rebut the presumption with respect to individual class members, and doing so in this case would require so many individualized inquiries as to defeat predominance.

1. California's "presumption" or "inference" of reliance applies only "*when the same material misrepresentations have actually been communicated to each member of a class.*" *Mirkin*, 858 P.2d at 574-75; *see also Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 100 Cal. Rptr. 3d 637, 653 (Ct. App. 2009) (explaining that presumption "does not come into play absent evidence of uniform material misrepresentations having been actually made to [each] class member"); *Mazza*, 666 F.3d at 596 (holding that no presumption of reliance applied when class members

33

viewed disparate information); *Carrera*, 702 F. App'x at 614-15 (same). California courts have reiterated this rule time and again.[3]

The requirement of a uniform material misrepresentation is critical, because the "presumption" is merely an evidentiary inference that individuals who are exposed to a material misstatement and who then take a particular action (*e.g.,* entering into a contract) relied on that misrepresentation. In *Vasquez v. Superior Court*, 484 P.2d 964, 972-73 (Cal. 1971) (in bank), for example, the court applied the "presumption" or "inference" where "defendants had made identical representations to each class member" through a standardized sales pitch, and each class member then purchased the products. *Mirkin*, 858 P.2d at 574 (explaining limited scope of *Vasquez* and the reliance presumption). Cases like *Vasquez* thus stand for the proposition that where there is an identical misstatement, evidence that the statement would be materially misleading to an ordinary person constitutes sufficient circumstantial evidence to trigger an inference that the plaintiff actually relied upon it. 484 P.2d at 972-73.

But the materiality of a particular statement cannot support a class-wide inference of reliance for class members who were exposed to *different* statements. Even if a jury were to find that a certain statement was materially misleading, it

---

[3]   *See, e.g.*, *Davis-Miller v. Auto. Club of S. Cal.*, 134 Cal. Rptr. 3d 551, 565 (Ct. App. 2011); *Knapp v. AT&T Wireless Servs., Inc.*, 124 Cal. Rptr. 3d 565, 575-76 (Ct. App. 2011).

cannot presume reliance "on the part of persons who never read or heard" *that* statement, and instead saw a different one. *Mirkin*, 858 P.2d at 574. And where there is no "common evidence as to what consumers perceived or what they would find material," no presumption or inference of reliance arises. *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 98 (Ct. App. 2009).

That rule squarely precludes Plaintiffs from invoking a presumption of reliance in this case. As explained above, class members have not been exposed to the same representations, because they each saw a different Potential Reach estimate, with a different degree of alleged inflation. Whether one of those statements is materially misleading is not circumstantial evidence of reliance as to a person who saw a fundamentally different statement.

2. In any event, even if the presumption were triggered under California law such that it would be applicable in a *state court* class action, it cannot apply to this federal class action in light of the dictates of the Rules Enabling Act.

"Rule 23's requirements must be interpreted in keeping with . . . the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge, or modify any substantive right.'" *Amchem*, 521 U.S. at 613 (quoting 28 U.S.C. § 2072(b)). Rule 23 thus may not "alter the defendants' rights or interests in a substantive way," *Olean*, 31 F.4th at 665, or relieve the plaintiff class of "carry[ing] the burden of proving every element of its claims to prevail on the merits," *Briseno*

*v. Conagra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017). For that reason, plaintiffs may use representative evidence in a class action only where that same evidence could also be "used to establish liability in an individual action." *Tyson Foods*, 577 U.S. at 458.

Applying a presumption of reliance here, where class members viewed *different* representations, would run afoul of the Rules Enabling Act, because it would permit a plaintiff to rely on a form of representative evidence that would not establish liability in an individual action. *Olean*, 31 F.4th at 665. In *Mirkin*, the California Supreme Court unequivocally rejected plaintiffs' argument that "pleading and proof of direct reliance by each victim of a fraud are not required where material misrepresentations are alleged." 858 P.2d at 575. Instead, a plaintiff in an individual action must plead and prove actual reliance to state a fraud claim. But, of course, a plaintiff in an individual action cannot show reliance by introducing evidence that a *different* person viewed a *different* statement.

Accordingly, even if California's presumption of reliance permits class members to establish liability with such evidence, that presumption cannot apply in a federal class action subject to the Rules Enabling Act. *Tyson Foods*, 577 U.S. at 458; *see also McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 549 (5th Cir. 2003) (holding that presumption of reliance was not available because any presumption that "relax[es] the substantive burdens of proof" as compared to an individual claim

would be incompatible with Texas's version of the Rules Enabling Act (citation omitted)); *cf. Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1302-03 (2010) (Scalia, J., in chambers) (suggesting that Louisiana state court decision holding that reliance need not be proved in class action, even though reliance was required for individual actions, would likely violate due process).

3. Finally, even if the presumption of reliance were triggered here, individualized issues would *still* predominate, because the presumption is rebuttable, and Meta is entitled to challenge the reliance of individual class members. *See, e.g.*, *Hinesley v. Oakshade Town Ctr.*, 37 Cal. Rptr. 3d 364, 371-72 (Ct. App. 2005) (finding presumption rebutted in individual action); *Dukes*, 564 U.S. at 367 (explaining that depriving defendants of right to litigate "defenses to individual claims" violates Rules Enabling Act). While "pick[ing] off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate," *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014), here, the record shows that process could require *hundreds of thousands* of individual mini-trials that defeat predominance, because Plaintiffs' own evidence indicates that a substantial portion of the class did not rely on any purported inflation in the Potential Reach estimates. Plaintiffs' expert initially found that *nearly half* of advertisers would actually *increase* their budgets if shown a targeted Potential Reach estimate that was 10% *lower*. *See* 2-ER-77. And, after

modifying the analysis to try to avoid this result, Plaintiff's expert *still* found no reliance for a substantial portion of the class, with 21% of advertisers setting *lower* budgets when the Potential Reach estimate was *higher*. *See* 2-ER-54. Meta also submitted evidence from advertisers attesting that they did not rely on Potential Reach in setting their budgets. *See, e.g.*, 2-ER-97; 2-ER-103.

That class members vary as to whether they relied on Potential Reach is not surprising, because the class consists of advertisers who are differently situated both with respect to their objectives for their ad campaigns and with respect to the range of information and data they weigh in making their purchasing decisions. *First*, with respect to objectives, most U.S. Meta advertisers use "conversion" or "consideration" objectives, which means advertisers want their ads delivered to users most likely to take desired actions, like clicking through to a website and making a purchase. *See* 5-ER-528–31, 575–79; 4-ER-406–07, 420–22; *see also* 2-ER-135–36. A much smaller number of advertisers use a "reach" objective, which seeks to maximize the number of people who see an ad. 4-ER-406–07; 5-ER-530–31. An advertiser paying by "conversion" (or click-through) will place substantially less weight—if any—on Potential Reach than an advertiser whose objective is maximizing reach. *See, e.g.*, 2-ER-113–14 (advertiser explaining that he does not rely on Potential Reach to set his budget because his objective is conversions). That places those advertisers in an inherently different situation than advertisers who purportedly

relied on Potential Reach, or who at a minimum used a "reach" objective and were thus more likely to rely on Potential Reach.

*Second*, advertisers have access to—and consider—a range of different information in making their advertising decisions, including other advertising metrics, results from past ad campaigns, and third-party marketing advice. For example, a smaller advertiser might rely entirely on Estimated Daily Results, which reflect the number of people expected to view an ad each day given the advertiser's budget (and other criteria), while disregarding Potential Reach because their actual audience will never be close to the maximum number of people within a targeting set given their budget constraints. *See* 5-ER-535–36; *see also* 2-ER-109. And an advertiser who has placed ads on Meta before, and thus has access to data tracking their results in real time, including actual impressions or clicks, will likewise attach different weight to Potential Reach estimates than a first-time user. *See* 5-ER-517, 537 (majority of spending was by repeat advertisers). Similarly, an advertiser using an agency with industry experience and access to vast historical information about the performance of certain types of ads may place very different emphasis on an abstract and preliminary estimate like Potential Reach, as compared to an advertiser without such sophisticated assistance. *See* 5-ER-537–39 (Meta expert explaining that many advertisers worked with ad agencies and consultants). And some advertisers also work directly with Meta's sales team, which tends to "employ more

sophisticated advertising strategies" based on "more relevant data," "rather than relying on Potential Reach estimates."  *See* 5-ER-537, 540.

These differences mean that advertisers will be subject to individualized defenses that must be separately litigated.  For example, Meta will have strong individual defenses with respect to the claimed reliance of an advertiser who used only conversion objectives and showed no indication of seeking to maximize reach, or with respect to an advertiser who used a professional ad agency that used its own proprietary data, rather than Meta's metrics.  *See, e.g.*, 2-ER-190.  Meta is entitled to litigate those—and its other—defenses with respect to each of the millions of members in the class.

Unsurprisingly, courts considering similar advertiser class actions have rightly found that such fundamental differences mean that plaintiffs cannot show that each class member "would attach materially similar significance" to the representations they viewed.  *IMB*, 2021 WL 3771785, at *16.  In *IMB*, for example, the court found that differences between Meta advertisers—largely the *same* advertisers with the *same* differences at issue here—precluded certification, because even determining *materiality* (much less reliance) would have required individualized inquiries in light of advertisers' differing objectives and "prior knowledge, experience, and expectations."  *Id.* at *17; *see also Singh v. Google LLC*, No. 16-cv-03734, 2022 WL 94985, at *8, *12 (N.D. Cal. Jan. 10, 2022) (holding

40

that "the varying levels of advertising sophistication in [the] class" precluded certification).

Just as in those cases, parsing class members who relied on inflation in their estimates from those who did not will require an analysis of each class member's individual considerations in placing ads. Because a jury will have to weigh the unique circumstances of each class member, individualized issues predominate and preclude class certification.

### 3. *Resulting injury cannot be proven on a class-wide basis*

Finally, Plaintiffs cannot show class-wide proof of resulting injury from the alleged inflation in the Potential Reach estimates. Under California law, a party asserting fraud must establish that it has suffered "damages" that "are the 'proximate' or 'legal' result of the fraudulent conduct," and even if a party establishes reliance, it may still fail to show injury if it has not actually suffered any out-of-pocket loss caused by that reliance. *OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 860 (Ct. App. 2007); *id.* at 861 (explaining that the "elements of reliance and proximate causation [of damages] are distinct"). Accordingly, even if a presumption of reliance were to apply in this case, each class member would *still* have to individually show injury from that reliance. But Plaintiffs have put forward no class-wide method to make that showing.

As an initial matter, the record is clear that a substantial portion of the class did not suffer injury in the traditional sense of seeing a misrepresentation and being induced to spend money as a result of their reliance on the misrepresentation. Advertisers are not charged based on Potential Reach estimates, 5-ER-525, and, as noted above, Plaintiffs' own expert found that 21% of advertisers set *lower* budgets when Potential Reach estimates were higher. *See* 2-ER-53–54. In other words, nearly a quarter of the class did *not* suffer an alleged injury with any "causal connection" to their "reliance on the representations." *OCM Principal*, 68 Cal. Rptr. 3d at 861 (citation omitted). And there is no administratively feasible way to separate class members who allegedly have been injured from those who have not. That alone should defeat class certification. *See Lara*, 25 F.4th at 1139 (finding predominance lacking where "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person"); *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Warner Chilcott Ltd. (In re Asacol Antitrust Litig.)*, 907 F.3d 42, 53-54 (1st Cir. 2018) (holding that where evidence showed 10% of the class was uninjured, predominance was lacking because the "need to identify those individuals will predominate").

To evade that consequence, Plaintiffs proposed a "price premium" theory, which posits that the allegedly inflated Potential Reach estimates induced *some* advertisers to increase their budgets and those budget increases purportedly then

raised market prices for every class member.  *See* 5-ER-619–20, 627; *see also* 5-ER-651; 5-ER-659–60, 662–63.

That novel workaround should have been firmly rejected.  The premise of "price inflation" theories like the one Plaintiffs posit is that the relevant market is efficiently assimilating the false information, thereby raising prices across the board, in the way the securities market is assumed to do under an efficient market hypothesis.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013) (explaining that in securities context, "efficient markets" are "well developed markets" that "are efficient processors of public information").  But there is no basis to apply that hypothesis to the unique market for online advertising.  Indeed, courts have specifically *rejected* the efficient market hypothesis even in the more traditional consumer fraud context, because, unlike the "highly regulated market for publicly traded securities," "consumer markets are diverse and multi-faceted" and thus less likely to react efficiently to any particular misrepresentation.  1 *McLaughlin on Class Actions* § 5.55 (18th ed., 2021 update); *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 224 (2d Cir.) (explaining that unlike the securities market, "the market for consumer goods . . . is anything but efficient"), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008); *In re POM Wonderful LLC*, Nos. ML 10-2199, et al., 2014 WL 1225184, at *4 (C.D. Cal.

Mar. 25, 2014) (noting that the court was not persuaded that the market for juice products "operates efficiently").

Any assumption that the alleged misrepresentations will be efficiently assimilated into the market price is even *less* warranted here than in a traditional consumer fraud case. That is because Meta's ad auction system is highly individualized, involving billions of separate auctions each day that are determined by the unique characteristics of the particular group of ads in each auction. *See* 4-ER-476–77, 486–90. Importantly, Meta's auctions do *not* turn only on the amount of the winning bidder's bid, but also on additional factors—like ad quality and the bids of *other* advertisers—that fall outside the normal bounds of supply and demand. *See* 4-ER-484–94; 2-ER-153–54. As a result, "[a]n advertiser's budget and bid are not the sole determinants of who wins an auction and the prices paid," 4-ER-501, and ad prices vary significantly across auctions, which are run billions of times per day for the billions of ads run on Facebook. 5-ER-559–60, 568, 570–71, 574, 582; 4-ER-492, 499–501, 503–05, 510–11. There is thus no way to determine whether an unknown advertiser who increases its bid in a particular auction will have any impact at all on the price a different advertiser ultimately pays in a different auction. *See Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 312 (3d Cir. 2016) (noting that an efficient market is more plausible in a "fixed-price market" than "an auction-style market with individually matched asks and bids").

The underlying premise of Plaintiffs' theory is thus unfounded and cannot support certification. In *Amgen*, the Supreme Court made clear that an efficient market must be established "before" a class can be certified. 568 U.S. at 462, 473. Plaintiffs fail to satisfy that prerequisite here, and attempting to assess which class members in fact paid more in any given auction will require individualized inquiries that plainly cannot be conducted on class-wide basis.

## C.   The District Court Improperly Ignored The Variations In The Class

The district court's opinion fails to provide any reasoned justification for the enormous class the court certified. To the contrary, the certification decision is premised on the remarkable contention that it is *irrelevant* that the millions of advertisers in this class saw different Potential Reach estimates, and that the variance in alleged inflation to which class members were exposed ranges from *de minimis* to over 50%.

In a few conclusory paragraphs, the court disregarded this fundamental problem by finding that the claims of the class could be proven on a class-wide basis, simply because there was *some* amount of inflation in the Potential Reach estimates, regardless of the conceded variation in the degree of inflation. In doing so, it conflated commonality—and common alleged misconduct—with predominance, which requires consideration of individualized issues. That superficial analysis fails to engage with any of the fundamental problems with this overbroad class.

45

1. The district court's analysis is flawed with respect to each of the core elements of Plaintiffs' fraud claims. With respect to falsity, the district court acknowledged that Plaintiffs' claims turn on an alleged "discrepancy between people and accounts" that purportedly made Potential Reach estimates "inaccurate," and it likewise recognized that "the numerical value of the inaccuracy *varied* across advertisers." 1-ER-11 (emphasis added); *see also* 1-ER-2. But, in a few conclusory sentences, the district court dismissed that conceded variation as irrelevant because "Potential Reach was always expressed as a number of 'people,'" and there was at least *some* discrepancy between the number of "people" and "accounts" as to all class members. 1-ER-11. In its view, that alone meant that "whether Meta made misrepresentations to all class members" could be "shown through common evidence." *Id.* But that is a non-sequitur. Whether an "estimate" is false or misleading depends on *how far* from the "true" value it is. The district court's assumption that falsity could be established regardless of the varying "disparity" in each representation was flatly wrong.

The district court's reasoning was even more opaque with respect to materiality. The court asserted this element could be shown on a class-wide basis because Potential Reach "is an important number" that is "shown to all advertisers." 1-ER-12. But the relevant question is not whether advertisers place value on the Potential Reach tool in general, but whether the *statement* generated by that tool was

materially misleading. An advertiser might well consider Potential Reach "important" but nonetheless not be misled, because the degree of inflation in the statement they viewed was not significant enough to be material to them, or because it was negated by a disclosure. The district court's focus on the general "importance" of Potential Reach just ignores the central materiality questions in the case.

The district court's consideration of reliance was similarly lacking. Without any analysis, the court concluded that the presumption of reliance applied, 1-ER-12, even though California law is clear that the presumption applies only when the class has been exposed to the "*same* material misrepresentations." *Mirkin*, 858 P.2d at 575 (italics altered). Meta squarely argued that the presumption was inapplicable, 1-ER-18, and yet the district court applied it without any analysis of or engagement with Meta's arguments.

Finally, the district court found injury susceptible to common proof based on Plaintiffs' experts' finding that it was "certain[]" that "for any advertisement with a Potential Reach of at least 1,000 people or more, the estimate would be significantly inflated above the actual number of people the advertisement could reach." 1-ER-12. But it is unclear why that finding would even be relevant to injury, because the mere fact of inflation in the Potential Reach estimates does not show that any particular advertiser paid more or otherwise suffered resulting injury from the representations.

In any event, the district court acknowledged that Meta's expert found that "sources of inflation are not distributed evenly across all smaller demographics that an advertiser might choose," *i.e.*, that inflation was not uniform across the class. *Id.* The court found that dispute immaterial because Meta's expert had not "conclude[d] that *no* inflation occurred at all." *Id.* (emphasis added). But that makes no sense. Even if there were *some* inflation in every class member's estimate, it is undisputed that many advertisers that viewed an "inflated" result did *not* respond by increasing their budgets—and thus suffered no injury from that alleged inflation. 1-ER-53–54 (Meta's expert explaining that Plaintiffs' expert found that 21% of advertisers set *lower* budgets when the Potential Reach estimate was higher). The district court's analysis provides no reasoned explanation for its conclusion of class-wide injury.

2. The district court's cursory analysis cannot support the novel and expansive fraud class it certified. Certification will paper over critical differences that cannot be ignored under basic principles of procedural fairness and due process. Indeed, the district court's certification order means that the following vastly disparate claims may be tried together, even though they plainly cannot be resolved "in one stroke," *Dukes*, 564 U.S. at 350:

- A government agency whose Potential Reach estimate was allegedly inflated by only 1% and who purchased ads throughout 2021, after Meta expressly clarified that Potential Reach estimates may include fake or duplicate accounts.

- A small business owner whose estimates were allegedly inflated by 40%, whose primary objective was to maximize reach, and who viewed Meta's disclosure that Potential Reach provides an "estimate" not designed to match population or census data.

- A Fortune 500 company who used a professional advertising consultant to develop its advertising strategy and who was expressly advised to look to metrics other than Potential Reach and thus never considered any particular Potential Reach estimate.

- A mid-sized online retail business whose Potential Reach estimate was allegedly inflated by 15%, but who had extensive past experience advertising through Meta, and had access to real-time, historical data about the actual performance of its ads, and adjusted budgets after considering that real-time data.

There is no reason to think those claims—or the countless other iterations that exist—should all be resolved in the same way with respect to the essential elements of a fraud claim. Trying them together will either require a host of individualized proceedings that render certification pointless or will deprive Meta of its due process right to litigate its individual defenses with respect to each class member. The class is untenable, and the district court's certification order cannot stand.

## II. THE NAMED PLAINTIFFS CANNOT REPRESENT THE CLASS

The district court also erred in certifying both the Rule 23(b)(2) and Rule 23(b)(3) classes because the named Plaintiffs suffer from flaws that preclude them from representing the class. *First*, the named Plaintiffs cannot satisfy the typicality and adequacy requirements of Rule 23(a) because their contradictory and dishonest testimony gives rise to unique defenses that will distract from the claims of the class.

*Second*, the named Plaintiffs lack Article III standing to seek injunctive relief and thus cannot represent the Rule 23(b)(2) class.

## A. The Named Plaintiffs Are Not Typical Of The Class Or Adequate To Represent The Class

The district court's class certification order should be reversed because neither of the named Plaintiffs is a typical or adequate representative for the over three million advertisers in the class.

Rule 23(a)'s typicality requirement is designed "to assure that the interest of the named representative aligns with the interests of the class." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019-20 (9th Cir. 2011) (citation omitted), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Typicality is not satisfied and "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Relatedly, adequacy asks whether class representatives will "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and where a plaintiff "is likely to devote too much attention to rebutting an individual defense," the named plaintiff is not adequate. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011).

Named plaintiffs are often rejected as class representatives, on either typicality or adequacy grounds, when they lack credibility on matters central to the

litigation. For example, in *Stearns*, this Court affirmed the lower court's finding of no typicality where the named plaintiffs brought deception-based claims but ultimately admitted they were not personally deceived. 655 F.3d at 1019-20. The Court determined that plaintiffs' conclusory "claim[s] to the contrary" were specious. *Id.* at 1019; *see also, e.g.*, *CE Design*, 637 F.3d at 726 (holding that a plaintiff with "serious credibility problems" is "not an adequate class representative"); *Savino v. Computer Credit, Inc*., 164 F.3d 81, 87 (2d Cir. 1998) (same).

Here, the named Plaintiffs suffer from credibility problems that expose them to individual defenses that "jeopardize[] the class's ability to prevail." 4-ER-341 (citation omitted). Specifically, both Plaintiffs provided inconsistent and dishonest testimony that was *expressly contradicted* by documentary evidence.

*First*, DZ Reserve's owner and operator, Dan Ziernicki, testified that the allegedly inaccurate Potential Reach estimates "ha[d]" "definitely" deterred him from purchasing ads and that the only business for which he had purchased ads was DZ Reserve, which last made purchases in 2018. 4-ER-382, 385–87 (Ziernicki deposition testimony); *see* 5-ER-543. But documentary evidence revealed that contrary to his testimony, during the pendency of this case, Ziernicki surreptitiously continued to purchase ads by forming new legal entities and using a friend's Facebook account. 5-ER-543, 548–49, 561; 4-ER-377–79, 388–95, 401–03; 4-ER-

354–56.  Ziernicki also told other Meta advertisers, in comments on a Facebook post, that "inflated" Potential Reach numbers "should *not* deter anyone" from using Facebook ads for e-commerce, contrary to his own testimony.  2-ER-75 (emphasis added).

*Second*, Maxwell claimed to have relied on Potential Reach to decide whether to advertise on Facebook and to "determine how much [he] wanted to budget," *see* 2-ER-34, but openly admitted during his deposition that his entire advertising strategy was to rely on an ad-buying tutorial that does not even *mention* Potential Reach.  2-ER-25–31, 38, 44; 5-ER-549–54; 4-ER-356–62.  Each of his ad budgets was set according to the specific rules in the tutorial, meaning his ad-purchasing decisions were not influenced by Potential Reach.  4-ER-362.  Indeed, Maxwell's ad purchasing data confirms there was no correlation between his ad budgets and changes in the Potential Reach estimates he viewed.  As the sample below shows, Maxwell set a budget of $20.00 or less *regardless* of whether his Potential Reach estimate was 1.3 million or 49.7 million.

| __Ad Name__ | __Potential Reach__ | __Budget__ |
|---|---|---|
| September Firearm Ad | 1.3 Million | $20.00 |
| February Firearm Ad | 39.7 Million | $5.00 |
| March Firearm Ad | 28 Million | $20.00 |
| December Knife Ad | 49.7 Million | $20.00 |

*See* 5-ER-593–94.[4]

Unsurprisingly in light of those facts, both Plaintiffs ultimately conceded that they likely would have *continued* to buy ads even if they had known about Potential Reach inflation, undermining their "claim[s] to the contrary" about reliance. *Stearns*, 655 F.3d at 1019; *see* 2-ER-67–68 (Ziernicki); 2-ER-43 (Maxwell).

The district court, however, did not engage with Meta's credibility arguments. Instead, it treated Meta's argument solely as a question of whether Plaintiffs in fact relied on Meta's representations, without discussing the contradictory evidence related to either Plaintiff. 1-ER-7–8. In doing so, it failed to recognize that, even if a trier of fact could ultimately conclude that named Plaintiffs relied on the alleged misrepresentations, serious credibility concerns can still defeat typicality and adequacy where there is a risk that "the rest of the class will suffer" because named Plaintiffs will be preoccupied with defending their own reliance. *CE Designs*, 637 F.3d at 726 (citation omitted). In other words, a "preliminary determination" that named plaintiffs are "vulnerable to serious attacks upon their credibility" is itself sufficient to render them inadequate. *Kline v. Wolf*, 702 F.2d 400, 401, 403 (2d Cir. 1983). And, while a defendant's mere claim that a plaintiff lacks credibility will not

---

[4] DZ Reserve's ad purchasing data similarly reflects no correlation between its budgets and its Potential Reach estimates. For example, DZ Reserve set a budget of $37 when its Potential Reach estimate was 270 million, but nearly doubled that budget when its Potential Reach estimate was 7.7 million. *See* 5-ER-588–89.

render a named plaintiff inadequate or atypical, where, as here, there is documentary evidence that refutes the named plaintiff's testimony, it is not enough simply to defer consideration of a named plaintiff's credibility to the merits stage, as the district court did. *See CE Designs*, 637 F.3d at 726-28 (finding named plaintiff inadequate where documentary evidence "raise[d] serious doubts concerning the truthfulness of [his] testimony").

In short, Plaintiffs' contradictory and baseless testimony "threaten[s]" to harm absent class members and "become the focus of the litigation." *Hanon*, 976 F.2d at 508 (citation omitted). It makes little sense for a class of millions of advertisers to be represented by individuals with such serious credibility problems. Indeed, it is vital for courts to closely assess whether named plaintiffs can appropriately fill their "fiduciary role as class representatives," *Kline*, 702 F.2d at 403, because named plaintiffs and their attorneys have significant incentives to paper over problems, to the detriment of absent parties whose interests the court must protect. The district court failed to do so here, and its adequacy and typicality holdings should be reversed.

## B.  The Named Plaintiffs Lack Article III Standing To Pursue Their UCL Claim For Injunctive Relief

The district court also erred in certifying the class under Rule 23(b)(2) for purposes of Plaintiffs' UCL claim. 1-ER-18.

As "class representatives," Plaintiffs themselves "must have Article III standing" to seek injunctive relief. *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 966 (9th Cir. 2019). To establish standing, Plaintiffs must show an injury that is both (i) "concrete [and] particularized," and (ii) "actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Plaintiffs cannot satisfy either requirement. Their asserted future injury is not concrete under the Supreme Court's recent decision in *TransUnion*, and it is not imminent under long-settled law. The Rule 23(b)(2) class should accordingly be decertified.[5]

### 1. Plaintiffs' asserted future injury is not concrete

In *TransUnion*, the Supreme Court held that an "informational injury that causes no adverse effects cannot satisfy Article III." 141 S. Ct. at 2214 (citation omitted). Rather, some "downstream" consequence must result from the alleged informational deprivation for a plaintiff to have standing. *Id.* (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)). Here, Plaintiffs allege a purely informational injury—*i.e.*, that they "will be unable to trust Meta's representations going forward." 2-ER-48; *see also* 1-ER-17. They do *not* claim

---

[5] Because standing issues "were part of the district court's class certification order" and "'properly enter[ed] the determination whether to certify a class,'" they are fit for appellate "review under Rule 23(f)." *Moser v. Benefytt, Inc.*, 8 F.4th 872, 875 (9th Cir. 2021) (citation omitted). Indeed, Article III standing is "a necessary threshold issue to review" in *any* appeal under Rule 23(f). *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 n.10 (3d Cir. 2012).

"they will incur additional damages if Meta's [alleged] activities continue," 2-ER-48, or allege any other kind of "downstream" harm from the deprivation of information. But a customer's bare interest in a service provider's future truth-telling does not satisfy *TransUnion*'s requirements. *Cf. Laufer v. Looper*, 22 F.4th 871, 880-81 (10th Cir. 2022) (explaining that, under *TransUnion*, a plaintiff claiming to have been "deprived of information" must show more than a "regulatory right to" it).

The district court's contrary conclusion rested entirely on this Court's decision in *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018). But the Supreme Court's decision in *TransUnion* overrules *Davidson* on this exact point. In *Davidson*, the plaintiff claimed she was harmed because she would be "unable to determine, based on the packaging, whether" the defendant's toilet wipes were "truly flushable." *Id.* at 962. The court found that merely being "unable to rely on [a] product's advertising or labeling in the future" *by itself* qualifies as a concrete injury. *Id.* at 969-70.

*Davidson*'s expansive view of cognizable informational harm is "clearly irreconcilable" with *TransUnion*. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). The *Davidson* plaintiff "identified no 'downstream consequences'" that would result "from failing to receive [accurate] information" in the future. *TransUnion*, 141 S. Ct. at 2214 (quoting *Trichell*, 964 F.3d at 1004). She therefore

56

faced no concrete harm under *TransUnion*. *See id.* Because the district court's analysis rested on a now-superseded case, it cannot stand.

Moreover, Plaintiffs' injury is even *less* tangible than the plaintiff in *Davidson*. In *Davidson*, the plaintiff at least had some (marginal) real-world stake in the dispute, because the characteristics of the defendant's product were material to future purchasing decisions: If the wipes were "truly flushable," she would buy them again. 889 F.3d at 962. Here, by contrast, Plaintiffs do not claim they would use Meta's advertising platform in the future only if their requested injunctive relief were granted. Rather, Plaintiffs want Potential Reach estimates that are "good data" for their own sake. 2-ER-42 (Maxwell deposition); *see also* 2-ER-67–68 (Ziernicki 30(b)(6) deposition) (admitting that DZ Reserve "[m]ost likely" would still have bought Meta ads even if it had been informed about allegedly "incorrect" data); 2-ER-43 (similar for Maxwell). That bare "desire for [Meta] to truthfully label its products" in the future is "insufficient" to demonstrate a concrete injury, even under *Davidson*. *See In re Coca-Cola Products Mktg. & Sales Practices Litig. (No. II)*, No. 20-15742, 2021 WL 3878654, at *2 (9th Cir. Aug. 31, 2021).

### 2. *Plaintiffs' asserted future injury is not actual or imminent*

Plaintiffs also lack Article III standing to seek injunctive relief for the independent reason that their asserted future injury—prospective mistrust of Potential Reach estimates—is not "actual or imminent." *Carney v. Adams*, 141 S.

Ct. 493, 498 (2020) (citation omitted). To "show the high degree of immediacy" required for standing to seek injunctive relief, Plaintiffs must demonstrate "'concrete plans'" to buy Meta ads in the future if Potential Reach estimates are altered or removed. *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996) (citation omitted); *accord Bain v. Cal. Teachers Ass'n*, 891 F.3d 1206, 1214-15 (9th Cir. 2018).

The district court found that Plaintiffs "establishe[d] [their] standing to pursue injunctive relief" because they "proffered deposition testimony [that] they would *consider* purchasing ads from Meta again if Meta corrected or removed the [allegedly] misleading Potential Reach metric." 1-ER-17 (emphasis added). That misapprehends the law. An equivocal assertion that one would merely "'consider buying' [the defendant's] products does *not* satisfy" Article III. *Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590, 591 (9th Cir. 2018) (emphasis added); *Coca-Cola*, 2021 WL 3878654 at *2. In fact, even a more definitive "profession of an 'inten[t]'" to do something, "without any description of concrete plans" or "specification of when" the action will be taken, "is simply not enough" to demonstrate an "'actual or imminent injury.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) (alteration in original) (emphasis and citation omitted); *see also Carney*, 141 S. Ct. at 500 (no standing even though plaintiff testified he "*would* apply for any judicial position" if given the chance (emphasis added) (citation omitted)).

58

Here, Plaintiffs failed to show a definitive intent to buy Meta ads again, let alone a concrete plan. The strongest statement from Maxwell was, "I *think* I would" buy Meta ads again "if I knew I was getting good data." 2-ER-42 (emphasis added). That "vague desire" to—maybe—buy Meta ads again if Potential Reach estimates are changed or removed is "insufficient" to "support a finding of [an] 'actual or imminent' injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (citation omitted); *see also Snake River Farmers' Ass'n v. Dep't of Labor*, 9 F.3d 792, 798 (9th Cir. 1993) (plaintiff's assertion of being "interested in future employment" was inadequate).

For its part, and contrary to the district court's mistaken assertion, DZ Reserve said *nothing* about its future intent. DZ Reserve said that it "[m]ost likely" would "have spent less" on Meta ads *in the past* if Potential Reach estimates had come with certain disclaimers. 2-ER-67–68; *see* 1-ER-17. "Without any stated desire to purchase [Meta ads] in the future," DZ Reserve cannot show the requisite concrete plans to do so. *Coca-Cola*, 2021 WL 3878654, at *2; *see also Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1088 (9th Cir. 2020) (observing that a "*desire* to purchase the product" is a prerequisite for demonstrating an imminent injury); *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 224-25 (3d Cir. 2012) (holding that plaintiffs lacked standing because they did "not allege that they intend to subscribe

again" to defendant's magazines); *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1273 (D.C. Cir. 1994) (similar).[6]

The decision to certify the UCL class under Rule 23(b)(2) should be reversed, or, in the very least, vacated for proper consideration of the Supreme Court's decision in *TransUnion*.

## CONCLUSION

For the foregoing reasons, the district court's class certification order should be reversed, and this case should be remanded for further proceedings.

Dated: October 31, 2022                     Respectfully submitted,


                                            /s/ Andrew B. Clubok
Elizabeth L. Deeley                         Andrew B. Clubok
Melanie M. Blunschi                         Susan E. Engel
Nicholas Rosellini                          Margaret A. Upshaw
LATHAM & WATKINS LLP                        LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000           555 Eleventh Street, NW, Suite 1000
San Francisco, CA  94111                    Washington, DC  20004
                                            (202) 637-2200
Samir Deger-Sen                             andrew.clubok@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY  10020


*Counsel for Appellant Meta Platforms, Inc.*

---

[6]   In fact, Plaintiffs have ceased their business operations altogether.  *See* 3-ER-295 (DZ Reserve); 2-ER-46 (Maxwell); *see also* Mot. Sum. J. 23, Dkt. No. 385-3. The theoretical possibility that they could revitalize their dormant businesses and buy Meta ads does not demonstrate a "*certainly* impending" injury.  *Lujan*, 504 U.S. at 564 n.2 (citation omitted); *see also Bain*, 891 F.3d at 1214; *Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86, 95 (11th Cir. 2022).

## STATEMENT OF RELATED CASES

Appellant is unaware of any cases pending in this Court that are related to this appeal, as defined and required by Circuit Rule 28-2.6.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 22-15916

      I am an attorney for Appellant Meta Platforms, Inc.

      This brief contains 13,897 words, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

      I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
      [ ] it is a joint brief submitted by separately represented parties;
      [ ] a party or parties are filing a single brief in response to multiple briefs; or
      [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** *s/ Andrew B. Clubok*        **Date:** October 31, 2022

**ADDENDUM**

**Pursuant to 9th Cir. R. 28-2.7**

**ADDENDUM**

**TABLE OF CONTENTS**

| Description | Page |
|---|---|
| U.S. Const. art. III, § 2 | ADD-1 |
| 28 U.S.C. § 2072 | ADD-2 |
| Federal Rule of Civil Procedure 23(a), (b), (f), and Rule 23(b)(3) advisory committee's note to 1966 amendment | ADD-3 |

# U.S. Const. art. III

\* \* \*

**Section 2**. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

\* \* \*

**28 U.S.C. § 2072**

## § 2072. Rules of procedure and evidence; power to prescribe

(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals.

(b) Such rules shall not abridge, enlarge or modify any substantive right. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

(c) Such rules may define when a ruling of a district court is final for the purposes of appeal under section 1291 of this title.

## Federal Rule of Civil Procedure 23

**Rule 23. Class Actions**

(a) PREREQUISITES. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) TYPES OF CLASS ACTIONS. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

\* \* \*

(F) APPEALS.  A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1).  A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered, or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf.  An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

\* \* \*

**1966 Amendment**

\* \* \*

Subdivision (b)(3). In the situations to which this subdivision relates, class-action treatment is not as clearly called for as in those described above, but it may nevertheless be convenient and desirable depending upon the particular facts. Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.  *Cf. Chafee*, *supra*, at 201.

The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members.  It is only where this predominance exists that economies can be achieved by means of the class-action device.  In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.  *See Oppenheimer v. F. J. Young & Co., Inc.*, 144 F.2d 387 (2d Cir. 1944); *Miller v. National City Bank of N.Y.*, 166 F.2d 723 (2d Cir. 1948); and for like problems in other contexts, *see Hughes v. Encyclopaedia Britannica*, 199 F.2d 295 (7th Cir. 1952); *Sturgeon v. Great Lakes Steel Corp.*, 143 F.2d 819 (6th Cir. 1944).  A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of

ADD-4

liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. *See Pennsylvania R.R. v. United States*, 111 F.Supp. 80 (D.N.J.1953); *cf. Weinstein*, *supra*, 9 Buffalo L.Rev. at 469. Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions. *See Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561 (10th Cir. 1961), *pet. cert. dism.*, 371 U.S. 801 (1963); *cf. Weeks v. Bareco Oil Co.*, 125 F.2d 84 (7th Cir. 1941); *Kainz v. Anheuser-Busch, Inc.*, 194 F.2d 737 (7th Cir. 1952); *Hess v. Anderson, Clayton & Co.*, 20 F.R.D. 466 (S.D.Calif.1957).

That common questions predominate is not itself sufficient to justify a class action under subdivision (b)(3), for another method of handling the litigious situation may be available which has greater practical advantages. Thus one or more actions agreed to by the parties as test or model actions may be preferable to a class action; or it may prove feasible and preferable to consolidate actions. *Cf. Weinstein*, *supra*, 9 Buffalo L.Rev. at 438-54. Even when a number of separate actions are proceeding simultaneously, experience shows that the burdens on the parties and the courts can sometimes be reduced by arrangements for avoiding repetitious discovery or the like. Currently the Coordinating Committee on Multiple Litigation in the United States District Courts (a subcommittee of the Committee on Trial Practice and Technique of the Judicial Conference of the United States) is charged with developing methods for expediting such massive litigation. To reinforce the point that the court with the aid of the parties ought to assess the relative advantages of alternative procedures for handling the total controversy, subdivision (b)(3) requires, as a further condition of maintaining the class action, that the court shall find that that procedure is "superior" to the others in the particular circumstances.

Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings. The court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit. *See Weeks v. Bareco Oil Co.*, 125 F.2d 84, 88-90, 93-94 (7th Cir. 1941) (anti-trust action); *see also Pentland v. Dravo Corp.*, 152 F.2d 851 (3d Cir. 1945), and *Chafee*, *supra*, at 273-75, regarding policy of Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C. § 216(b), prior to amendment by Portal-to-Portal Act of 1947, § 5(a). [The present provisions of 29 U.S.C. § 216(b) are not intended to be affected by Rule 23, as amended.]

In this connection the court should inform itself of any litigation actually pending by or against the individuals. The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be

quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable. The burden that separate suits would impose on the party opposing the class, or upon the court calendars, may also fairly be considered. (*See* the discussion, under subdivision (c)(2) below, of the right of members to be excluded from the class upon their request.)

Also pertinent is the question of the desirability of concentrating the trial of the claims in the particular forum by means of a class action, in contrast to allowing the claims to be litigated separately in forums to which they would ordinarily be brought. Finally, the court should consider the problems of management which are likely to arise in the conduct of a class action.

* * *