No. 22-15916

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DZ RESERVE and CAIN MAXWELL d/b/a MAX MARTIALIS,
*Plaintiffs-Appellees*,

v.

META PLATFORMS, INC., f/k/a FACEBOOK, INC.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California, Case No. 3:18-cv-04978-JD
The Honorable James Donato

**BRIEF OF AMICUS CURIAE DIGITAL CONTENT NEXT
IN SUPPORT OF APPELLEE AND AFFIRMANCE**

David M. Berger (SBN 277526)
GIBBS LAW GROUP LLP
1111 Broadway, Suite 2100
Oakland, California 94607
(510) 350-9700
dmb@classlawgroup.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Digital Content Next (DCN) is a non-profit, tax-exempt 501(c)(6) organization incorporated in New York. DCN has no parent corporation, and no publicly held corporation has 10% or greater ownership in DCN.

DATED: January 20, 2023      Respectfully submitted,

By:   */s/David M. Berger*

David M. Berger
GIBBS LAW GROUP LLP
1111 Broadway, Suite 2100
Oakland, California 94607
(510) 350-9700
dmb@classlawgroup.com

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

STATEMENT OF IDENTITY AND INTEREST ............................. 1

ARGUMENT ........................................................................................ 1

I.    Audience size is a fundamental metric used by advertisers to allocate spending and determine performance ........................ 1

II.   Inflating the potential reach metric harms advertisers and unfairly distorts the advertising marketplace. ....................... 4

III.  Accountability is important because Facebook's ad metrics are not audited to the same degree as other mediums. .......... 8

CONCLUSION ................................................................................... 9

FORM 8: CERTIFICATE OF COMPLIANCE FOR BRIEFS ....... 11

CERTIFICATE OF SERVICE ...................................................... 12

# TABLE OF AUTHORITIES

Other Authorities                                                                                    Page(s)

Adi Robertson, *Facebook employee warned it used 'deeply wrong' ad metrics to boost revenue,* THE VERGE (Feb. 18, 2021), https://www.theverge.com/2021/2/18/22289232/facebook-ad-revenue-proposed-reach-inflation-lawsuit-unredacted-filings .........4

Garett Sloane, *Twitter, Facebook Take First Step to Give Marketers an Audit of Brand Safety*, ADAGE (July 21, 2021), https://adage.com/article/digital-marketing-ad-tech-news/twitter-facebook-take-first-step-give-marketers-audit-brand-safety/2352156 ..................................................................................9

Hugh M. Cannon and Edward Riordan, 1994, *Effective Reach and Frequency: Does It Really Make Sense?*, https://www.researchgate.net/publication/258311203_Effective_Reach_and_Frequency_Do_They_Really_Make_Sense ..................................................................2

Kerry Flynn, *The big con: How tech companies made a killing by fudging their numbers*, MASHABLE (January 18, 2018), https://mashable.com/article/silicon-valley-companies-misleading-metrics..............................................................................8

Tim Peterson, *FAQ: Everything Facebook has admitted about its measurement errors*, MARTECH (May 17, 2017), https://martech.org/heres-itemized-list-facebooks-measurement-errors-date/. ..................................................................8

Patrick Kulp, *Advertisers want Facebook to stop 'grading its own homework,'* MASHABLE (Nov. 16, 2016), https://mashable.com/2016/11/16/facebook-metrics-advertiser-trust/........................................9

Sara Lebow, *Google, Facebook, and Amazon to account for 64% of US digital ad spending this year*, INSIDER INTELLIGENCE (Nov. 3, 2021), https://www.insiderintelligence.com/content/google-facebook-amazon-account-over-70-of-us-digital-ad-spending ..................................................................................5

Seth Fiegerman, *Facebook admits it messed up more ad metrics*, CNN (Nov. 16, 2016), https://money.cnn.com/2016/11/16/technology/facebook-ad-metrics/index.html ............................................ 7

Yunjae Cheong, John D. Leckenby, and Tim Eakin, 2005, *Evaluating the Multivariate Beta Binomal Distribution for Estimating Magazine and Internet Exposure Frequency Distributions Questions*, https://www.jstor.org/stable/23048730 .......... 2

## STATEMENT OF IDENTITY AND INTEREST[1]

Founded in 2001, Digital Content Next is the only trade organization dedicated to serving the unique and diverse needs of high-quality digital content companies, which enjoy trusted, direct relationships with consumers and advertisers. DCN's members are many of the most trusted and well-respected media brands. Approximately 80% of the revenue generated by its members' digital businesses comes from advertising. In addition, DCN's member companies advertise extensively with Facebook to promote their original content, engage with existing subscribers and audiences, and find new audiences.

## ARGUMENT

**I.  Audience size is a fundamental metric used by advertisers to allocate spending and determine performance.**

Audience size metrics, such as Facebook "potential reach," are fundamental to the advertising economy. The metric allows for media

---

[1] All parties consent to the filing of this amicus brief. No party's counsel authored the brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person, other than the amicus curiae, its members, or its counsel, contributed money that was intended to fund preparing or submitting the brief.

1

properties to offer inventory that is easily comparable and understood by buyers. This apples to apples comparison serves as the foundation for a functional advertising marketplace.

From the advent of the advertising industry in the 19th century, advertising campaigns were purchased based on a variety of "reach" metrics. Put simply, how many people will potentially see my advertisement if I pay to run it? As broadcast media began to flourish, a second dimension, "frequency," was added to the decision-making so that advertisers could also take into account how many times the person would see the advertisement and avoid paying to run ads to the same group of people over and over.[2] And with time and technology, advertising has greatly expanded to be able to measure endless engagement and conversion metrics, even offering advertisers the opportunity to pay based on them. But the heart of any ad purchase remains the "potential reach" of a campaign.[3]

---

[2] "Effective Reach and Frequency: Does It Really Make Sense?," Hugh M. Cannon and Edward Riordan, 1994; https://www.researchgate.net/publication/258311203_Effective_Reach_and_Frequency_Do_They_Really_Make_Sense.

[3] "Evaluating the Multivariate Beta Binomal Distribution for Estimating Magazine and Internet Exposure Frequency Distributions," Yunjae Cheong, John D. Leckenby, and Tim Eakin, 2005. https://www.jstor.org/stable/23048730.

Every advertising medium offers a version of this metric to advertisers. For example, television broadcasters provide advertisers a metric (traditionally through Neilsen ratings) regarding the total viewership. Radio stations provide advertisers a metric (traditionally through Arbitron ratings) regarding the total listeners. Newspapers provide advertisers information on their readership. All these baseline metrics convey to advertisers the same fundamental information: the size of the total potential audience that could see or hear an ad on the medium.

When advertisers decide to launch an advertising campaign, they begin by defining their target market for the campaign. Who are they trying to reach? Once they've determined their target for their campaign, they then begin to plan how they may best find these people in order to achieve their goals. As part of this process, they may assess the potential reach metrics of various inventory suppliers in order to decide how much budget to allocate to different advertising mediums, whether that is print, television, or digital. If a certain medium – such as social media via Facebook – appears to have a far greater and growing audience size compared to other mediums, such as print or

3

television, an advertiser may favor the medium with the larger audience for efficiency alone.

Indeed, Facebook internally acknowledges that its potential reach metric is "arguably the single most important number in [its] ads creation interfaces," and that "[w]hen creating advertising campaigns, advertisers frequently rely on the estimated audience to understand the potential reach of their campaigns and set the bid and budget strategy."[4]

## II. Inflating the potential reach metric harms advertisers and unfairly distorts the advertising marketplace.

Any inflation by Facebook of its potential reach metric would be particularly damaging to advertisers and to the advertising market more generally. As noted, advertisers of all sizes rely on audience size metrics to allocate spending and to determine performance. Thus, if Facebook overstates its potential reach, advertisers will allocate larger portions of their advertising budgets to Facebook and away from other channels. Inflating the potential reach numbers will further distort

---

[4] 5-ER-610; *see also* Adi Robertson, *Facebook employee warned it used 'deeply wrong' ad metrics to boost revenue,* THE VERGE (Feb. 18, 2021), https://www.theverge.com/2021/2/18/22289232/facebook-ad-revenue-proposed-reach-inflation-lawsuit-unredacted-filings.

4

advertisers' ongoing budgeting decisions by inaccurately suggesting that there remains a larger untapped potential audience than actually exists.

Facebook's inflated potential reach metric also risks distorting the advertising market as a whole. During the relevant time period, Facebook and Google accounted for approximately 60% of digital advertising dollars.[5] These two market leaders set a bar used to evaluate all other digital advertising. In addition, these same two companies heavily influence the rules and methods by which digital advertising is sold.

Facebook presents to its advertising clients that it can offer supposedly industry-leading microtargeting coupled with the scale of audience unmatched by other publishers. According to Facebook, not only can it offer granular targeting defined by the advertiser (using behavioral data, demographic data, intent data), but that advertisers could then reach that granular target audience at scale over the life of the campaign. As a result, advertisers likely increased their spend with

---

[5] Sara Lebow, *Google, Facebook, and Amazon to account for 64% of US digital ad spending this year*, INSIDER INTELLIGENCE (Nov. 3, 2021), https://www.insiderintelligence.com/content/google-facebook-amazon-account-over-70-of-us-digital-ad-spending.

Facebook, sometimes significantly, often to the detriment or complete exclusion of other publishers and media.

Facebook's inflation of its potential reach, however, further entrenched its dominant position and inflicted direct harm on its competitors. A rational advertising planner will allocate ad budget dollars to media that have the largest potential audience size and lowest price with respect to the target audience. Thus, as an example, if Facebook overstates its audience size to an advertising planner targeting the 18-24 year-old female cohort expressing a certain behavior, that would unquestionably and unfairly advantage Facebook. Conversely, if the advertising planner saw that cohort was shrinking on Facebook, the planner would be more likely to shift the ad budget elsewhere where this cohort was indeed growing and there was less risk of declining effectiveness, or at the very least simply spend less on Facebook.

This inflation of the potential reach metric may be considered ironic due to Facebook's key value proposition of precise microtargeting of individuals on its platform. However, the issue is further exacerbated by the proximity of the inflated metrics to the actual advertising

purchase. Facebook's advertising platform exists as a self-service platform in which advertising campaigns are set up and purchased without any human involvement by Facebook so the "potential reach" is presented only moments and clicks prior to the purchase creating persistent and ongoing distortion of the market opportunity.

Facebook's behavior is unsurprising to those who have observed its development. Facebook has a history of incorrectly reporting its own metrics. In September 2016, only after being sued by advertisers, Facebook admitted that it had significantly overstated the duration of videos shown to consumers.[6] In November 2016, Facebook admitted that it had overstated the count of its video views, average time consumers spent on Instant Articles and the number of people businesses reached with unpaid posts on their Facebook Pages.[7] In

---

[6] Seth Fiegerman, *Facebook admits it messed up more ad metrics*, CNN (Nov. 16, 2016), https://money.cnn.com/2016/11/16/technology/facebook-ad-metrics/index.html.

[7] *Id.*

7

December 2016, Facebook also admitted that it had overestimated the number of consumers that advertisers could reach across its platform.[8]

### III. Accountability is important because Facebook's ad metrics are not audited to the same degree as other mediums.

Lastly, it is important to note that Facebook's advertising inventory has not been held to the same standards as the inventory offered by its competitors. Established by Congress in the 1960s,[9] the Media Ratings Council (MRC) develops minimum standards for measurement, and accredits and audits measurement services. Virtually the entire digital advertising industry abides by the codes of the MRC and willingly undergoes regular audits.

For years, however, Facebook refused to abide by the MRC guidelines or subject itself to these audits. It was only after Facebook's metrics were called into question by both the press and advertising clients that Facebook began what has been a five-year process to

---

[8] Tim Peterson, *FAQ: Everything Facebook has admitted about its measurement errors*, MARTECH (May 17, 2017), https://martech.org/heres-itemized-list-facebooks-measurement-errors-date/.

[9] Kerry Flynn, *The big con: How tech companies made a killing by fudging their numbers*, MASHABLE (January 18, 2018), https://mashable.com/article/silicon-valley-companies-misleading-metrics.

accomplish some of the earliest steps of auditing which Google and others have long deployed.[10]

In essence, Facebook rebuffed the recognized industry standards in order to maintain the ability to police themselves. Bob Liodice, CEO of the Association of National Advertisers noted "It's like having the ability to grade your own homework."[11] This dynamic allowed Facebook to hide its inflated potential reach metrics from advertisers and its competitors – and it underscores the need for accountability at law.

## CONCLUSION

Facebook's potential reach metric is a fundamental metric that is material to every advertising purchase and its inflation distorts advertising markets to the detriment of advertisers and publishers, including DCN's members. The district court's decision certifying the class should be affirmed to allow the full and transparent adjudication of these important issues.

---

[10] Garett Sloane, *Twitter, Facebook Take First Step to Give Marketers an Audit of Brand Safety*, ADAGE (July 21, 2021), https://adage.com/article/digital-marketing-ad-tech-news/twitter-facebook-take-first-step-give-marketers-audit-brand-safety/2352156.

[11] Patrick Kulp, *Advertisers want Facebook to stop 'grading its own homework'*, MASHABLE (Nov. 16, 2016), https://mashable.com/2016/11/16/facebook-metrics-advertiser-trust/.

DATED: January 20, 2023	Respectfully submitted,

By: */s/David M. Berger*

David M. Berger
GIBBS LAW GROUP LLP
1111 Broadway, Suite 2100
Oakland, California 94607
(510) 350-9700
dmb@classlawgroup.com

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 22-15916

I am the attorney or self-represented party.

**This brief contains** 1,821 **words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ David M. Berger  **Date** 1/20/23
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**  Rev. 12/01/22

## CERTIFICATE OF SERVICE

I certify that on January 20, 2023, I electronically filed the foregoing Amicus Curiae brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: January 20, 2023          GIBBS LAW GROUP LLP

                                 By: /s/ David M. Berger

                                 David M. Berger
                                 *Counsel for Amicus Curiae*