No. 22-15916

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DZ R<small>ESERVE</small> and C<small>AIN</small> M<small>AXWELL</small> (d/b/a Max Martialis), individually and on behalf of others similarly situated,

*Plaintiffs-Appellees,*

v.

M<small>ETA</small> P<small>LATFORMS</small>, I<small>NC</small>. (f/k/a Facebook, Inc.),

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California, Case No. No. 3:18-cv-04978-JD
The Honorable James Donato

APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD

VOLUME 2 OF 6 (2-SER-301 to 2-SER-318)

REDACTED

Geoffrey Graber
Andrew N. Friedman
Karina G. Puttieva
Madelyn Petersen
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
ggraber@cohenmilstein.com

Eric Kafka
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor,
New York, NY 10005
Telephone: (212) 838-7797
ekafka@cohenmilstein.com

Charles Reichmann
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849

*Counsel for Plaintiffs-Appellees and the Class*

# Exhibit 140

## UNREDACTED VERSION OF

## DOCUMENT SOUGHT TO BE SEALED

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1                  UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF CALIFORNIA
 3                     SAN FRANCISCO DIVISION
 4
 5   DZ RESERVE, and CAIN MAXWELL
     (d/b/a MAX MARTIALIS),
 6   individually and on behalf of
     all others similarly
 7   situated,                            No. 3:18-cv-04978-JD
 8              Plaintiffs,
 9         vs.
10   FACEBOOK, INC.,
11              Defendant.
     _____/
12
13
                    -- ATTORNEYS' EYES ONLY
14         CONFIDENTIAL UNDER PROTECTIVE ORDER--
15
          VIDEO-RECORDED DEPOSITION OF DAN JON ZIERNICKI
16
                     REMOTE ZOOM PROCEEDING
17
                        DENVER, COLORADO
18
                     Monday, July 13, 2020
19
20
21
22   Job No. 4162889-1
23   REPORTED BY:
24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25   Pages 1 - 222
```

Page 1

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
1    GoDaddy account with the same credit cards that I had in
2    2000, so that account has, you know, a lot there, so I
3    don't have a specific credit card number or way to tell
4    you what was used to pay for those accounts.
5         Q.   Okay.  So -- and -- and you mentioned -- you          11:31:49
6    mentioned something happened at the end of 2018.  You had
7    massive issues.  What were you talking about?  What were
8    these massive issues you're talking about at the end of
9    2018?
10             MR. GRABER:  Objection.  Objection to form.           11:32:06
11             THE WITNESS:  According to Facebook, I sold in a
12   14-day span approximately $50 million worth of product.
13   The reality was about $40,000 worth of product.  I
14   presented the evidence to Facebook and attempted to
15   resolve it in a cordial manner.  I couldn't even get the       11:32:27
16   time of day or a Facebook rep to speak with me on the
17   phone.  They said everything was 100 percent accurate, so
18   I was forced into disputing those charges.  As a result,
19   I lost my Facebook account and access to advertise.
20        Q.   BY MS. DEELEY:  And was that in December of           11:32:55
21   2018?
22        A.   What is "that"?  What do you mean by "that"?
23        Q.   What you just described, the issue -- the
24   dispute you had with Facebook over the products that you
25   said were -- the discrepancy between the products that         11:33:16
```

Page 47

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1      Q.  Do you -- did you hear my question?
 2      A.  No.  I'm sorry.  I didn't hear your question.
 3      Q.  I asked, what do you mean 3-8x ROAS?
 4      A.  Three to 8 times return on ad spend.
 5      Q.  Okay.  And what's return on ad spend?            15:57:47
 6      A.  It means a ROAS of 3 on a $100 spend would be
 7   $300.  So if you spend $100, you would have returned 300.
 8      Q.  300 of what?
 9      A.  I'm sorry?
10      Q.  300 of what?                                      15:58:08
11      A.  I was giving you an example.  Three to 8 times
12   return on ad spend.  An example would be if you spent
13   $100 on an ad and that ad returned $300, it would have
14   been a return on ad spend 3 ROAS.
15      Q.  And I guess my question is the $300 is 300 what?  15:58:30
16   You sold $300 worth of goods from $100 worth of ad spend?
17      A.  Correct.  Sales conversion is what I believe the
18   metric would be on Facebook.
19      Q.  Okay.  And did you look at ROAS when you were --
20   was that one of the things you looked at to determine     15:58:49
21   whether your ads were performing well?
22          MR. GRABER:  Objection.  Objection to form.
23          THE WITNESS:  Yeah.  There was a variety of
24   factors I looked at.  And obviously, you know, purchases,
25   costs per purchase and ROAS were -- were important.      15:59:05
```

Page 153

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1   There were many important metrics, you know.
 2           Potential reach was important when analyzing
 3   your ads.  You wanted to see how much of the audience
 4   you've gone through.  If you've gone through a lot of the
 5   audience, you need to know that the majority of your        15:59:22
 6   audience or your potential reach is taken up.  So
 7   there -- there are a lot of important metrics to look at.
 8       Q.   BY MS. DEELEY:  Okay.  So in looking at the
 9   performance of your ads specifically, what were the
10   metrics that you looked at?                                 15:59:35
11           MR. GRABER:  Objection.  Objection to form.
12           THE WITNESS:  I tried to analyze all the
13   metrics.
14       Q.   BY MS. DEELEY:  What was the most important
15   metric to you when you were analyzing the performance of    15:59:46
16   your ads?
17           MR. GRABER:  Objection.  Objection to form.
18           THE WITNESS:  You know, obviously the ads have
19   to be -- they have to make sense from a business
20   standpoint to run.  You need to be -- you're running --     16:00:01
21   you're in business to make a profit.
22           But at the same token, I mean, as I mentioned,
23   for an advertiser, you're going on to Facebook to build
24   your business.  And you're going there to -- to build
25   good, reliable data under pixels so it can mature, so it    16:00:17
```

Page 154

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

1   don't sometimes.  I'm asking you:  Were there any
2   campaigns where you looked at it?
3           MR. GRABER:  Objection.
4           THE WITNESS:  I believe I've answered that now a
5   few times.  And the answer is yes.                        16:13:11
6       Q.  BY MS. DEELEY:  Thank you.
7           Okay.  Going back to the message that we were on
8   on Exhibit 32.  Your -- is this the experience that we
9   discussed earlier, where you had a dispute with Facebook
10  in connection with sales results that were being          16:13:58
11  reported?  Are you referring to that same dispute in your
12  message to Ivy on --
13      A.  Yes.
14      Q.  -- November 29th?
15      A.  I believe so.                                     16:14:11
16      Q.  Okay.
17          MR. GRABER:  Objection.
18          And Dan, just be careful.  Let -- make sure you
19  let her finish her question before you answer.  And make
20  sure you let me make my objection and then answer.        16:14:20
21          THE WITNESS:  Okay.
22          MR. GRABER:  It's hard.
23          THE WITNESS:  Just sometimes she goes down, and
24  then I think the question's over.
25      Q.  BY MS. DEELEY:  Okay.  It's -- it's tricky.  And  16:14:35

Page 164

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1   it's also a pause.  So my apologies.  I'll try to -- I'll
 2   try to --
 3           Okay.  So in this message, you also mention that
 4   you opened a dispute with -- via AmEx?
 5        A.  Yes.                                                 16:14:51
 6        Q.  And this was the AmEx chargeback that you
 7   mentioned earlier?
 8        A.  That is correct.
 9        Q.  Okay.  And it says, "Of course that violates
10   terms, so they shut it down."                                 16:15:00
11           What are you referring to when you say, "Shut it
12   down"?
13        A.  I'm assuming I'm referring to the business
14   accounts -- the account.
15        Q.  DZ Reserve's -- the one with                         16:15:16
16   dzreserve17@gmail.com?
17        A.  The entire Business Manager access to the one
18   for Dan Ziernicki.
19        Q.  Okay.
20        A.  Or excuse me.  Ziernicki Dan.                        16:15:28
21        Q.  Okay.  And that's Facebook that you said shut it
22   down?
23        A.  Correct.
24        Q.  Okay.  And then if you go to the next page --
25   and this was -- just to confirm again, this was the           16:15:42
```

Page 165

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1   existent," what is the "this" you're referring to?
 2          MR. GRABER:  Again, I'm going to allow him to
 3   answer this, because I just -- I want you to get what you
 4   need, Beth.
 5          But just caution the witness to be careful        16:51:23
 6   divulging communication with counsel.  You can answer
 7   that question.
 8          THE WITNESS:  So it was in regards to video
 9   reporting data.
10     Q.   BY MS. DEELEY:  Okay.  And the dispute that you   16:51:42
11   were referring to, the dispute with Facebook you had,
12   this is the dispute in which you -- that you described
13   earlier in which you did a chargeback with AmEx; is that
14   correct?
15     A.   That's correct.                                   16:51:57
16          MR. GRABER:  Objection.  Objection to form.
17     Q.   BY MS. DEELEY:  It would be the dispute that you
18   described on Exhibit 32, Bates ending 22136, the second
19   message on the page with that Bates Number, where you
20   say, "Well, so I was in this position.  I was raising    16:52:13
21   budgets like crazy, because I'm seeing 3 to 8 times ROAS
22   during BFCM.  So it makes sense.  And maybe four to five
23   days after, I see a $30 million transaction, which gets
24   me suspicious.  And I start looking at the data.  It's
25   way off.  I mean, I wrote up a 30-page report.  And they 16:52:34
```

Page 180

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
1    wouldn't even take a look.  The manager replied by email.
2    I could have installed a pixel wrong.  After two years,
3    zero issues.  And then replied, 'We looked into this, and
4    the data is accurate,' and closed the case.  So I opened
5    up the dispute with AmEx."                                   16:52:50
6            Is that the dispute you're referring to?
7            MR. GRABER:  Objection.
8            THE WITNESS:  It does sound like -- it does
9    sound like it's the dispute I'm referring to, but I am --
10   I am not on the same page as you on the document.  Can       16:53:01
11   you tell me the Bates Number, please?
12       Q.  BY MS. DEELEY:  Yes.  It's 22136.
13       A.  Thank you.
14           Okay.  I have it now.  And, yes, that is what I
15   was referring to.                                             16:53:15
16       Q.  Okay.  And this was the dispute you had with
17   Facebook about conversion; correct?
18       A.  Conversion value purchases being inflated.
19   Among other things, yes.
20       Q.  And then if you go to the message we were just        16:53:30
21   on at 22137, you go on in the next sentence to say, "That
22   lawsuit is for misreporting of way less significant
23   data."
24           And the lawsuit you're referring to there is the
25   lawsuit that you were not involved with involving video?      16:54:00
```

Page 181

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
1          MR. GRABER:  Objection.
2          THE WITNESS:  I think World Gift Deals is one of
3   the first, if not the first, domain I activated on
4   WooCommerce, and it is possible that I have used World
5   Gift Deals on Facebook, although I don't know if these    17:51:53
6   specific ads would be that example.  I don't know if
7   these are actually ads or just posts.
8          Q.  BY MS. DEELEY:  Yeah.  I'm just asking generally
9   if you did advertise for World Gift Deals on Facebook?
10         MR. GRABER:  Objection.                            17:52:07
11         THE WITNESS:  I think I attempted to advertise
12  World Gift Deals on Facebook.  I don't believe I ever
13  successfully did.
14         Q.  BY MS. DEELEY:  Okay.  And that was because your
15  account was shut down?                                    17:52:20
16         MR. GRABER:  Objection.
17         THE WITNESS:  Yeah.  Through -- through my
18  efforts to start advertising again, they were -- you
19  know, I couldn't -- I couldn't get my ads to publish.
20         Q.  BY MS. DEELEY:  Okay.  So let me ask again:  Did  17:52:39
21  you ever purchase advertisements from Facebook for the
22  business you operated called World Gift Deals?
23         A.  I do not recall if World Gift Deals made
24  purchases for ads on Facebook.  I believe that this
25  was -- World Gift Deals was -- my recollection is around  17:52:57
```

Page 210

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1   '18, '19 is when it was starting, and I had still
 2   attempted to use Facebook ads through some of the ways
 3   that we discussed and that I was unsuccessful doing so.
 4        Q.  Okay.  So at least as of 2020, you were not
 5   purchasing ads on Facebook for World Gift Deals?           17:53:22
 6        A.  That is correct.
 7        Q.  And did World Gift Deals have any advertisements
 8   on Facebook in 2020?
 9        A.  I don't believe so.
10        Q.  I should say through Facebook.  Any ads          17:53:42
11   purchased through Facebook in 2020?
12        A.  I don't believe so.
13        Q.  Okay.  And in 2019, did World Gift Deals
14   purchase -- was any -- excuse me.
15            In 2019, was any advertising on Facebook         17:53:59
16   purchased for the business World Gift Deals?
17            MR. GRABER:  Objection.
18            THE WITNESS:  So that -- that's the one that I
19   have a -- I know that this was the new domain that I
20   would have tried to use after I had all the issues, and   17:54:16
21   whether I was successful or not to start advertising, I
22   don't recall specifically for World Gift Deals.
23        Q.  BY MS. DEELEY:  Okay.  If you did, would it have
24   been early 2020?
25            MR. GRABER:  Objection.                          17:54:38
```

Page 211

```
 1         THE WITNESS:  I believe if I did, it would -- it
 2   would have been early 2019.
 3         Q.  BY MS. DEELEY:  Early 2019?
 4         A.  Right.
 5         Q.  Okay.  And was there anyone else that worked on      17:54:53
 6   World Gift Deals with you?
 7         MR. GRABER:  Objection.
 8         THE WITNESS:  I had, you know, virtual
 9   assistants who created the images.  I had virtual
10   assistants who would have created the advertisement            17:55:14
11   videos.
12         Q.  BY MS. DEELEY:  Other than the virtual
13   assistants, did you have anyone else work on World Gift
14   Deals with you?
15         A.  No.                                                  17:55:29
16         Q.  Is there anyone other than you that would have
17   purchased advertising on Facebook for World Gift Deals?
18         A.  No.
19         Q.  Do you know ██████?
20         A.  Yeah.  He is someone I knew in college.              17:55:51
21         Q.  And at Loyola Marymount?
22         A.  That is correct.
23         Q.  Do you still know him?
24         A.  I haven't seen or spoken to ██████ in years.
25         Q.  You graduated the same year as ██████ right?        17:56:14
```

Page 212

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A. Correct. | |
| 2 | Q. And ▮ isn't associated with World Gift | |
| 3 | Deals? | |
| 4 | A. No, he's not. | |
| 5 | Q. Did you try to use ▮ Facebook account to | 17:56:30 |
| 6 | purchase advertising on World Gift Deals? | |
| 7 | A. You know, a year -- a-year-and-a-half ago, like | |
| 8 | I said, when I had my experience with Facebook, I tried | |
| 9 | to go every direction I could to not only fix the problem | |
| 10 | that I had with Facebook, but to get back into business, | 17:56:47 |
| 11 | and I took a variety of different routes, and one of | |
| 12 | those could have been reaching out to college friends to | |
| 13 | see if they could help me. | |
| 14 | Q. Okay. By help you, you mean help you by | |
| 15 | allowing you to go on their Facebook accounts to purchase | 17:57:03 |
| 16 | advertising? | |
| 17 | A. That would be one way that I would ask a friend | |
| 18 | if that's possible, yes. | |
| 19 | Q. Did you ever ask ▮ if you could go | |
| 20 | on his Facebook account to purchase advertising? | 17:57:14 |
| 21 | A. I believe I did ask him in 2018, '19, if I could | |
| 22 | do that. | |
| 23 | Q. And did you purchase advertising using ▮ | |
| 24 | ▮ Facebook account? | |
| 25 | A. I don't believe -- | 17:57:28 |

Page 213

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
1          MR. GRABER:  Objection.
2          THE WITNESS:  -- it was ever actually purchased.
3          Q.  BY MS. DEELEY:  Did you attempt to make --
4    advertise -- did you attempt to purchase advertising
5    using the Facebook account of anyone other than                17:57:59
6    ███████████?
7          A.  Some of the references we've gone over today,
8    you know, I had attempted a variety of different things
9    to get back on to Facebook.  I explored buying an
10   account.  I explored accessing through family or friends,      17:58:17
11   but through all those channels, what I experienced is
12   that when I tried to get on Facebook and it's not -- you
13   know, I don't know what security protocols you guys have
14   today, but it always would be problematic.
15         Q.  Okay.  But my question was different.  I'm           17:58:34
16   asking if there was anyone other than ███████████ that
17   you attempted -- let me back up.
18         Was there anyone's Facebook account other than
19   ███████████ that you used to purchase Facebook
20   advertising?                                                   17:58:55
21         MR. GRABER:  Objection.
22         THE WITNESS:  I don't believe I asked anyone
23   else to buy -- to get access to their Facebook to use
24   Facebook ads.
25         Q.  BY MS. DEELEY:  Okay.  Do you remember when we       17:59:06
```

Page 214

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1   talked about this earlier and I said, "Did you use your
 2   girlfriend's Facebook account," we went over that
 3   discussion?  Did you ever use your girlfriend's Facebook
 4   account to try to purchase advertising on Facebook?
 5           MR. GRABER:  Objection.                            17:59:22
 6           THE WITNESS:  I likely tried to use my
 7   girlfriend's account to try to use Facebook again.
 8       Q.  BY MS. DEELEY:  Okay.  And what's your
 9   girlfriend's name?
10           MR. GRABER:  Objection.                            17:59:35
11           THE WITNESS:  Her name is ██████
12       Q.  BY MS. DEELEY:  What's her last name?
13       A.  ██████
14       Q.  Can you spell it, please?
15       A.  ██████████                                         17:59:46
16       Q.  What email address of ██████ did you use to
17   try to access Facebook to purchase advertising?
18           MR. GRABER:  Objection.
19           THE WITNESS:  I wouldn't remember what her
20   log-in is or what I asked -- if I asked for her log-in or  18:00:10
21   anything like that.  I wouldn't remember a year and a
22   half ago.
23       Q.  BY MS. DEELEY:  You don't know her email
24   address?
25           MR. GRABER:  Objection.                            18:00:20
```

Page 215

ATTORNEYS' EYES ONLY CONFIDENTIAL UNDER PROTECTIVE ORDER

```
1           THE WITNESS:  I know -- I know her email
2    address.
3        Q.  BY MS. DEELEY:  What's the email address?
4           MR. GRABER:  Objection.
5           THE WITNESS:  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮            18:00:30
6        Q.  BY MS. DEELEY:  Okay.  Other than attempting to
7    purchase Facebook advertisements through ▮▮▮▮▮▮
8    Facebook account and through ▮▮▮▮ Facebook account, did
9    you attempt to purchase Facebook advertising from anyone
10   else's account?                                 18:00:47
11       A.  When this occurred, I attempted many different
12   things to try to get back to advertising on Facebook.  I
13   don't have a specific example or what I did or didn't
14   try, but I know I tried a lot of different things.
15       Q.  And you did get back on and were able to do 18:01:05
16   advertising; isn't that right?
17       A.  From -- what do you mean?
18       Q.  In 2019, did you use other people's Facebook
19   accounts to log in to Facebook and advertise for any of
20   your businesses?                                18:01:29
21       A.  My recollection is that my Facebook account was
22   still active early 2019, my personal Facebook account.
23       Q.  Okay.  My question was different.  I'm asking at
24   any time in 2019, did you use anyone's Facebook account
25   other than your own to purchase advertising on Facebook? 18:01:49
```

Page 216

INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

To assist you in making corrections to your deposition testimony, please follow the directions below. If additional pages are necessary, please furnish them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make, insert the corrections on the errata sheet beside the page and line numbers.

If you are in possession of the original transcript, do NOT make any changes directly on the transcript.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet, above the designated "Signature" line.

**ERRATA SHEET**

**Page : Line**

| 216:5 | **Change**: |
|       | **Reason:** error |

___X___  Subject to the above changes, I certify that the transcript is true and correct.

_____  No changes have been made. I certify that the transcript is true and correct.

**Signature**  *[signed]*  **Date: 8/27/2020**